**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVE COX,
          *Petitioner-Appellant,*

    v.

FRANKIE SUE DEL PAPA,
          *Respondent-Appellee.*

No. 06-15106

D.C. No.
CV-98-00482-PMP

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
August 15, 2007—San Francisco, California

Filed September 4, 2008

Before: Diarmuid F. O'Scannlain, Michael Daly Hawkins,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge O'Scannlain

12225

## COUNSEL

Paul G. Turner, Assistant Federal Public Defender, Las Vegas, Nevada, argued the cause for the petitioner-appellant

and filed briefs; Franny A. Forsman, Federal Public Defender and Danice Arbor Johnson, Research & Writing Specialist, Las Vegas, Nevada, were on the briefs.

David Neidert, Senior Deputy Attorney General, Las Vegas, Nevada, argued the cause for the respondents-appellees; Catherine Cortez Masto, Attorney General and Dennis C. Wilson, Deputy Attorney General, filed and were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Constitution requires that a trial court conduct a *sua sponte* examination of a criminal defendant's *Miranda* waiver when his competency to stand trial has been raised.

I

Sometime in March 1990, Steve Cox left Vallejo, California, headed to Tennessee in a 30-year old truck with a football-sized hole in the windshield. He carried approximately $16,000 in cash. Upon arrival in Las Vegas, Nevada, Cox stopped to repair his ailing truck. While there, he became involved with Carita Wilson, a prostitute with an extensive criminal record. Cox checked into the Days Inn Motel in North Las Vegas, accompanied by Wilson. The next day, on March 22, 1990, hotel employees found Wilson's strangled body in the hotel room. When police arrived, they noted that Wilson had a television cord wrapped around her wrist and a towel around her throat.

Later that day, Officers Scott Tyman and M. L. Ransom of the Arizona Highway Patrol arrested Cox about nine miles from Winslow, Arizona. Officer Tyman told Cox that he was

being "detained for committing the crime of being a fugitive of justice" and read him his *Miranda* rights from a Department-issued card.[1] Cox "acknowledge[d] that he understood the *Miranda* warnings." Tyman asked him whether he knew why he was being arrested, and Cox stated that he "was framed, that it was self-defense." Ransom "asked him whether he killed anybody," whereupon "[Cox] said that the girl had come to him with fangs and fingernails and that he only choked her around the neck long enough to subdue her, to get away." Cox "talked a lot" for the next 10 minutes. The officers then took him to the county jail and documented his property, which included roughly $8,000 in cash.

A week later, Detectives Bruce Scroggin and Jack Larason of the North Las Vegas Police Department went to Arizona to interview Cox. They "advised Mr. Cox of his rights and he chose not to talk to [them]." Cox also made clear that he "did not wish to return or come willingly back [to Nevada]." After obtaining a governor's warrant to bring Cox back to Nevada, Detective Scroggin returned to Arizona in May 1990, this time joined by Detective A. Calvert. Prior to departing with Cox, Scroggin read Cox his *Miranda* rights. Again, Cox acknowledged that he understood his rights.

Detective Scroggin also told Cox that he and Detective Calvert "were not going to question him about the incident at all" during the ride back to Las Vegas. However, Cox decided to speak spontaneously "for almost 10 hours straight about everything under the sun."[2] Among other things, Cox told the detectives that Wilson had emerged from the bathroom with her hair dripping wet and wrapped in a towel, that she had

---

[1]The account presented here comes from the testimony of Officer Tyman, and Cox does not dispute its truth. Officer Tyman testified with reference to a report that he wrote "the same night [Cox] was arrested," when the events were "very fresh in [his] memory."

[2]Cox does not argue that the officers asked him questions or pressured him to speak.

"flipped out," and that Cox had to remove the towel and restrain her, causing her to pass out. When she awoke, she again "flipped out" and he again had to restrain her because she was "acting bizarre and devilish." She passed out again, and after he restrained her a third time, she did not regain consciousness. At this point, he checked her pulse, found it to be "racing at 90 miles an hour and [ ] felt she was going to die," and left the hotel "hoping someone would find her and take care of her."

A

On April 11, 1990, state prosecutors in Clark County, Nevada, charged Cox with murder with use of a deadly weapon. Before trial, several psychiatrists examined Cox to determine whether he was competent to stand trial. Psychiatrist Dr. Franklin Master explained that he "did not get a feeling of psychosis, but rather felt that [Cox] was attempting to malinger because of the seriousness of the charge against him." And although Dr. Master noted "the possibility that this individual's behavior on the night in question might well have been influenced by his use of cocaine," and "the possibility that even now there could be residual effects of heavy cocaine use," he concluded that Cox was not "currently [ ] under the influence of any substance," and was "competent to assist counsel."

In a report dated several months later, psychiatrist Dr. William O'Gorman recorded Cox's family history and assessed his mental state. He found that Cox exhibited "a moderate degree of repression and suppression," signs of "a personality disorder of a mixed type with noticeable paranoid trends and some preoccupation, overcompensation and some immaturity with impulsiveness in his relationships with people." However, Dr. O'Gorman discerned "no true disorganization of personality," noted that Cox "denie[d] being addicted to cocaine," and concluded that "Cox [wa]s knowledgeable to

the events that transpired regarding the present charge and c[ould] assist his attorney in his own defense if he so desire[d]."[3]

Two other psychiatrists who examined Cox later on disagreed, however, and opined that Cox was *not* competent to stand trial. Dr. Jack Jurasky wrote that Cox was "intelligent, cooperative, fluent, and articulate," but "suffer[ed] from a psychotic process called 'Delusional Disorder' as manifested by florid paranoid and grandiose delusions about his importance." He stated that he believed Cox should be considered " 'Guilty But Mentally Ill' " but not "Not Guilty by Reason of Insanity" because Cox "certainly comprehend[ed] the nature and quality of the charges against him and respond[ed] to those charges relevantly in the manner by which he denie[d] them."

Less than a month later, Dr. William Pike evaluated Cox and rendered the following diagnosis: "Schizoaffective disorder, manic, chronic." He stated his "firm opinion that [Cox] [wa]s not able to effectively cooperate with counsel in the defense of his case and [wa]s not competent to stand trial," urging that Cox "should be hospitalized for treatment."

The trial judge held a competency hearing on June 25, 1991, and considered the reports of the doctors who had examined Cox over the past year. On August 6, 1991, the trial judge held Cox incompetent to stand trial, found that Cox "would constitute a danger to the safety of himself and to society if released from custody," and concluded "that commitment is required for a determination of his ability to attain competence." Cox was transferred to the Lakes Crossing Center, a mental health facility.

---

[3]Dr. O'Gorman evaluated Cox again a second time and found his emotion "controlled," "no evidence of hallucinations," and repeated his finding that Cox has a "paranoid personality" but no "psychotic reaction" and was thus competent to assist his attorney at trial and understand the charges and potential penalties.

On January 2, 1992, the trial court impaneled a "Sanity Commission" to reevaluate Cox. The Sanity Commission, guided by the reports of three doctors, opined that Cox was still incompetent. The trial court recommitted Cox to Lakes Crossing on February 11, 1992, and ordered that Cox receive periodic competency evaluations.

On March 27, 1992, the trial judge impaneled a second Sanity Commission, received its reports, and found that Cox had become competent to stand trial. The court scheduled the trial to begin, and Cox and the government stipulated that the death penalty would not be pursued. The parties also stipulated that the court would determine the sentence if Cox were found guilty. However, the trial judge rejected the sentencing stipulation, believing state law to require the jury to decide the sentence.

B

Trial began on May 24, 1993, on the charge of first degree murder.[4] Cox was represented by counsel. At trial, Officers Tyman and Ransom testified to the inculpatory statements that Cox made to them at the time of his arrest. Detectives Scroggin and Calvert testified to the inculpatory statements that Cox made to them during the car ride from Arizona to Nevada. A jury found Cox guilty of first degree murder and rendered a special verdict imposing life in prison without the possibility of parole.

In due course, Cox appealed to the Nevada Supreme Court, which held that state law did not require that a jury impose sentence and that the trial court should have sentenced Cox, pursuant to the parties' stipulation. It remanded the case for resentencing by the trial judge. On September 29, 1994, the trial court resentenced Cox to life in prison without possibility

---

[4]The court amended the criminal information to remove "with use of a deadly weapon."

of parole. Cox appealed his sentence on grounds of judicial bias, but the Supreme Court of Nevada affirmed.

Still seeking relief in state court, Cox filed a Motion for Acquittal and a Motion for an Advisory Opinion. Construing these motions as a habeas corpus petition, the state trial court rejected Cox's claims of ineffective assistance of counsel at trial and at sentencing, and held that he waived his other claims by failing to raise them on direct appeal. The Supreme Court of Nevada affirmed this final state appeal on April 10, 1998.

## C

Cox next petitioned for habeas relief under 28 U.S.C. § 2254, asserting various constitutional violations including ineffective assistance of counsel at trial and sentencing.[5]

The district court deemed several claims unexhausted and offered Cox a choice between abandoning them or having the court dismiss the petition *in toto* "so that [Cox] c[ould] attempt to exhaust his unexhausted claims and thereafter return with a petition ready for review on the merits of all his claims." Cox chose to abandon the unexhausted claims— which, importantly, included his claim of ineffective assistance of counsel at trial. Ultimately, the district court denied the habeas petition and Cox's request for a certificate of appealability, but a panel of our court granted the certificate and Cox timely appealed.

---

[5]The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this case, because Cox filed his original federal habeas petition on August 24, 1998. Under AEDPA, we review the district court's decision to deny a habeas petition de novo. *Benn v. Lambert*, 283 F.3d 1040, 1051 (9th Cir. 2002).

A habeas petition must be denied unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1)

## II

Cox first argues that because the state trial court received psychiatric evaluations that revealed some doubts as to his competency to stand trial, the court should also have ordered, *sua sponte*, a hearing on his cognitive ability to waive his *Miranda* rights.

## A

**[1]** The Supreme Court has never held that a trial court must order *sua sponte* a hearing regarding a defendant's cognitive ability to waive his *Miranda* rights. In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) itself, the Court has "concluded that in the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980). Before a court may introduce statements made by a suspect in custody and under interrogation, "[t]he government has the burden of proving that the defendant has knowingly and voluntarily waived his *Miranda* rights." *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984) (internal citations omitted). Although "the State need prove waiver only by a preponderance of the evidence," *Colorado v. Connelly*, 479 U.S. 157, 168 (1986), "[t]his burden is great" and "[w]e must indulge every reasonable presumption against waiver of fundamental constitutional rights." *Heldt*, 745 F.2d at 1277. The government satisfies its burden only if it makes two prerequisite showings:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the

> "totality of the circumstances surrounding the inter-
> rogation" reveal *both* an uncoerced choice and the
> requisite level of comprehension may a court prop-
> erly conclude that the *Miranda* rights have been
> waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (emphasis
added).

The distinction between a claim that a *Miranda* waiver was
not voluntary, and a claim that such waiver was not knowing
and intelligent, is important. "The voluntariness of a waiver
. . . has always depended on the absence of police overreach-
ing." *Colorado*, 479 U.S. at 170. In other words, the voluntar-
iness component turns upon external factors, whereas the
cognitive component depends upon mental capacity.
Although courts often merge the two-pronged analysis, the
components should not be conflated.[6] Here, Cox challenges
only the cognitive component.

### B

Cox claims that lack of mental capacity bars admission of
his statements to Officers Tyman and Ransom upon his arrest,
as well as his statements to Detectives Scroggin and Calvert
on the ride from Arizona to Nevada. But, *Miranda* only
applies to the first set of statements; the latter statements were
clearly spontaneous.[7] Although Cox correctly notes that the
government "do[es] not argue that [he] was not in custody,"

---

[6]The distinction is reflected in the different standards of review: the
question of voluntariness (whether the defendant's will was overborne) is
reviewed *de novo*, but the question of cognitive capacity (whether the
defendant had the requisite mental state as a factual matter) is reviewed
for clear error. *Collazo v. Estelle*, 940 F.2d 411, 415-16 (9th Cir. 1991) (en
banc).

[7]Cox objects that "an inquiry was never made as to his competency to
waive his *Miranda* rights in March *and May* of 1990." (emphasis added).

*Miranda* applies only "where a suspect in custody is *subjected to interrogation.*" *Innis*, 446 U.S. at 300 (emphasis added).[8]

Cox does not dispute that Detective Scroggin told him that the detectives "were not going to question him about the incident at all." Therefore, we confine our analysis to the statements he made to Officers Tyman and Ransom when they held him in custody and interrogated him in his Las Vegas jail cell.

### C

To show valid waiver, the government offered Officer Tyman's testimony, which indicated that Cox had "acknowledge[d] that he understood the *Miranda* warnings"; Cox did not present evidence to suggest otherwise.[9] However, Cox

---

[8]In *Innis*, officers investigating a murder arrested a suspect, but the shotgun used to commit the crime had not been found. *Innis*, 446 U.S. at 294. During the car trip, two officers conversed, and one commented that " 'there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.' " *Id.* at 294-95. The "officers' comments struck a responsive chord," and the suspect was "suddenly [ ] moved to make a self-incriminating response [offering to show the officers the location of the gun]." *Id.* at 303. The Court held that the suspect's right to counsel was not violated, because "the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response." *Id.*

[9]The record includes a mental health report written in 2000, in which the examiner found that Cox suffered from a delusional or paranoid disorder and retrospectively opined that "without treatment, it [wa]s inconceivable that Mr. Cox's condition improved and he was mentally competent [to stand trial]." The examiner also opined that Cox's "statements to the arresting officers *may* not have resulted from a knowing and intelligent waiver of his *Miranda* rights." Although the examiner concluded that "Cox has a delusional disorder affecting his ability to make rational decisions including waiving his *Miranda* rights," he did not go so far as to state that Cox's waiver was, *in fact*, not knowing and intelligent. It is not clear what additional medical examination would have helped illuminate that issue, and Cox does not argue that further examination would refute the government's testimonial evidence supporting the validity of the waiver.

claims that the trial court's early finding of incompetency should have alerted both his lawyer and the court, *sua sponte*, to the need to conduct an evaluation and hearing as to whether he had the mental capacity to waive his *Miranda* rights.[10] Without holding a special hearing and evaluation of competency, Cox argues, the trial court could not find a valid *Miranda* waiver.

The Nevada Supreme Court rejected this argument, noting that "Cox d[id] not claim his *Miranda* waiver was invalid; he merely complain[ed] that there was never a formal evaluation of its validity." In any event, Cox argues that the state trial court violated due process by ignoring all obvious signs that he lacked the psychological capacity at the time of arrest to understand and knowingly waive his *Miranda* rights.

[2] Cox primarily relies on *Johnson v. Zerbst*, 304 U.S. 458 (1938), to support his view that a trial court has a protective duty to hold a hearing *sua sponte* on whether a defendant in these circumstances validly waived his *Miranda* rights. *Zerbst*, however, addressed a waiver of the Sixth Amendment right to counsel. There, the trial court made no finding that the defendants knowingly and intelligently waived their right to counsel and permitted the trial to proceed, whereupon the defendants were tried, convicted, and sentenced, without assistance of counsel. *Id.* 460. The Supreme Court reversed. "The Sixth Amendment withholds from federal courts, in all criminal proceedings, the power and authority to deprive an

---

[10]Cox's counsel objected to the introduction of Detective Scroggin's report regarding Cox's statements in the car, but *Miranda* does not apply to such spontaneous statements, as explained above. Furthermore, the lawyer simply objected to the tardy nature of the disclosure of certain written statements by Detective Scroggin, which included details previous reports had not. Such objection, of course, did not address Cox's competence to waive his *Miranda* rights.

Most importantly, Cox's counsel never objected to the introduction of the statements Cox made to Officers Tyman and Ransom on March 22, 1990.

accused of his life or liberty unless he has or waives the assistance of counsel." *Id.* at 463. To protect the right to counsel, a court must ascertain affirmatively that waiver is knowing and intelligent:

> The constitutional right of an accused to be represented by counsel invokes, *of itself*, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.

*Id.* at 465 (emphasis added).

The Court then remanded the case, with the instruction that the defendant bore the burden of proof to show that "he did not competently and intelligently waive his right to counsel." *Id.* at 469. Indeed, the Court shifted the burden of proof of waiver: "Where a defendant, without counsel, acquiesces in a trial resulting in his conviction and later seeks release by the extraordinary writ of habeas corpus, *the burden of proof rests upon him* to establish that he *did not* competently and intelligently waive his constitutional right to assistance of [c]ounsel." *Id.* at 468-69 (emphasis added); *see also United States v. Santiago Soto*, 871 F.2d 200, 201 (1st Cir. 1989) (stating that "the conventional wisdom among our sister circuits is that, absent a defendant's request for a hearing on the issue of voluntariness, or at least an objection to the admission of an incriminating statement or confession into evidence, the requirement of a hearing is waived").

**[3]** Cox invokes *Zerbst* for the proposition that the "protecting duty" articulated there applies equally to *Miranda* waiv-

ers. He leans on *Minnick v. Mississippi* for support: "[W]e have adhered to the principle that nothing less than the *Zerbst* standard for the waiver of constitutional rights applies to the waiver of *Miranda* rights." 498 U.S. at 160. However, the so-called "*Zerbst* standard" to which the Court referred in *Minnick* was merely the requirement that a waiver be voluntary, knowing, and intelligent:

> The *Zerbst* waiver standard, and the means of applying it, are familiar: Waiver is "an intentional relinquishment or abandonment of a known right or privilege," and whether such a relinquishment or abandonment has occurred depends "in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

*Id.* at 159 (quoting *Zerbst*, 304 U.S. at 464). No Supreme Court case suggests that the protective duty of the court applies to *Miranda* waivers generally. Nor does AEDPA permit an extension of the Supreme Court's *Zerbst* decision to the very different issue at bar. The need for court assistance with respect to a waiver of trial counsel does not suggest a similar need for court assistance when a defendant already has the assistance of counsel.[11] Thus, *Zerbst* cannot support Cox's claim that the trial judge had a protective duty to order a hearing to ensure that his waiver was knowing and intelligent, rather than determining simply whether the government had met its burden of proof.

[4] "Given the lack of holdings from [the Supreme] Court . . . it cannot be said that the [Nevada Supreme C]ourt 'unreasonabl[y] appli[ed] clearly established Federal law.' " *Carey v. Musladin*, 127 S. Ct. 649, 654 (2006) (citing § 2254(d)(1)).

---

[11]The defendant may, of course, elect to represent himself. And if he chooses representation by another, who then fails to assist him adequately, he may file an ineffective assistance of counsel claim.

Therefore, Cox is not entitled to habeas relief on his *sua sponte* hearing claim.

### III

Cox also argues that he suffered from ineffective assistance of counsel because defense counsel failed to develop and to present a mitigating case at sentencing.[12]

### A

**[5]** To prevail on an ineffective assistance of counsel claim, a defendant must show that his counsel's performance was deficient and prejudiced the outcome. *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984).

> "[To establish deficiency,] a defendant must show that counsel's representation fell below an objective standard of reasonableness." To establish prejudice he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Williams*, 529 U.S. at 390-91 (quoting *Strickland*, 466 U.S. at 688, 694).

**[6]** In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court explained that the *Strickland* standard governs counsel's obligation to investigate and to present mitigating evidence at sentencing. In *Wiggins*, two defense lawyers limited their investigation to Wiggins's Pre-Sentence Investigation Report and Department of Social Services records. *Id.* at 533.

---

[12]Cox formally abandoned his claim that trial counsel was ineffective because "he made no effort to have Cox examined to determine if he was competent to be [re]sentenced in September, 1994."

They investigated no further, although they were aware of Wiggins's troubled background. The Court found that their limited "investigation into Wiggins' background did not reflect reasonable professional judgment" and was "neither consistent with the professional standards that prevailed . . . nor reasonable in light of the evidence counsel uncovered in the social services records." *Id.* at 534. The lawyers' deficient performance prejudiced Wiggins, because available evidence of his "severe privation and abuse" and the "physical torment, sexual molestation, and repeated rape [he suffered during many] years in foster care," *id.* at 535, " 'might well have influenced the jury's appraisal' of Wiggins' moral culpability." *Id.* at 538.

**[7]** The Court's decision in *Wiggins* did not alter the standard set forth in *Strickland*. Nor did the case unsettle the rule that counsel has " "wide latitude . . . in making tactical decisions" and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. However, *Wiggins* did make clear that deference should not be given unless counsel completes an adequate investigation. *See Wiggins*, 539 U.S. at 536 ("[C]ounsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable."). What constitutes an adequate investigation again requires reference to *Strickland*:

> [Counsel] has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . . In short,

inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions.

*Strickland*, 466 U.S. at 691.

B

We must therefore determine whether the Nevada Supreme Court's decision to deny Cox relief was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" with respect to his claim that his counsel did not fulfill his duty to investigate and to present available mitigating evidence.[13] 28 U.S.C. § 2254(d)(1). A review of the resentencing proceeding is essential.

First, the judge noted that the sentencing choices were "life with and life without the possibility of parole," and asked Cox whether he had anything to suggest: "This is your time to tell me what you think is appropriate relative to the sentence." Cox responded by insisting on his innocence and noting that his wife, who was present but whom he "ha[d no]t seen in three years," also believed he was innocent. Cox then cited several mitigating circumstances, such as that he "had no problems or complaints within the system," was "not a troublesome person," and "ha[d] no prior records in regards to being an adult offender." He also noted "mitigating circumstances which were not brought up in the trial," including "the

---

[13]*Strickland*, *Williams*, *Wiggins*, and *Schriro v. Landrigan*, 127 S.Ct. 1933, 1942 (2007), described *infra* at 12250-51, all involved the assistance of counsel in the penalty phases of *capital* cases. They did not expressly state that the same standard would apply in non-capital cases, such as the one at bar. However, the government implicitly agrees with applying this standard to non-capital cases, for it also relies upon Supreme Court capital sentencing precedents to illuminate the proper standard.

In any case, Cox's claims lack merit even when evaluated under the high standard set forth in the Court's death penalty jurisprudence.

cocaine incident and the conspiracy to set me up to cause my death and robbery, which you know I had a large amount of money"[14] and Wilson's "extensive criminal record."[15] He added that although he "grieve[d] for the loss of a life," he felt that Wilson had been "causing many losses . . . and heartaches of families, too" and "[i]t's just that at this time, [the] situation went the other way."

The court then allowed Cox's counsel to offer mitigating evidence. The lawyer began by giving the judge a brief letter that Cox's wife had "just handed [him]." Then counsel reminded the judge that the prosecution had offered Cox a plea agreement whereby Cox would have pled guilty to second degree murder and would have faced only a sentence of five years to life in prison.

Next, counsel argued that the court should consider Cox's potential for safe release. He argued that Cox was no longer inclined toward the kind of violent behavior that he had exhibited as a juvenile.[16] Reading from the most recent Pre-Sentence Investigation report, the lawyer noted that "[s]ince his arrival in [prison], [Cox] ha[d] sustained no disciplinary sanctions and ha[d] adjusted within acceptable standards" and "[c]ontact with his current case worker indicated Cox programs well." Counsel pointed out that another report stated that Cox was "polite and courteous at all times," was "not a problem to anyone," and was "trying to cope within the system."

---

[14]Cox apparently was convinced that Wilson conspired to take his money (and acted as if demonically possessed). *See supra* at 12231 (describing testimony by Cox's arresting officers that he had told them "he was framed, that it was self-defense," and "the girl had come to him with fangs and fingernails").

[15]The judge excluded such evidence and Cox sought federal habeas relief on that ground, which the district court denied. Cox does not appeal that ruling.

[16]*See infra* note 19 & accompanying text.

Counsel then explained that his own investigations had revealed some positive aspects of Cox's character and potential for living a lawful existence. During the long period between trial and sentencing, the lawyer explained, he had traveled to Northern California and had spoken to Cox's wife and "some of his associates and others."

> I met with a man in San Francisco who worked for the City of San Francisco in their housing department who talked to me and told me of the marvelous work Steve did as journeyman carpenter on this gentleman's personal properties. He said he would trust him with his life. Because, he said he did beautiful work, he was honest and truthful in everything that he did for him.

Counsel stated that others had expressed "that same feeling about [Cox] and didn't understand why he was in the [criminal] situation." They speculated that his actions were caused by "the drugs that he got involved with."

Building upon that suggestion, counsel sought to reduce Cox's culpability by emphasizing his "use of cocaine" and "mental problems." He explained that Cox had misunderstood the fits Wilson was having and had honestly believed she would hurt him: "He responded to something he thought was taking place because of the drugs that were in his system and what was going on in that hotel room. And he's convinced to this day that's what happened; you've heard him say that." (referencing Cox's testimony that he believed Wilson would harm him).

At this point, however, Cox interrupted his counsel: "Your Honor, there was no drugs in my system. And I refute that allegation by my counsel, if I may, as a defendant." He insisted that Wilson was involved in a conspiracy to rob him and began to repeat his testimony on this score, although the judge reassured him that he had "heard all that at trial." Still

attempting to persuade the judge that he was not delusional, Cox told the judge: "I refused to take drugs, even at Lakes Crossing [mental health facility]. No drug was ever dispensed to me."

Confronted with this resistance from Cox, counsel changed his strategy. He emphasized that sentencing Cox to life in prison *with* possibility of parole would not endanger society, because it would simply leave open the possibility that, *at some later point*, Cox might be deemed no longer to pose a threat to society: "I think it should be within the power of the Parole Board to look at him and say is he of such a state of mind that it's safe for him to be on the streets again. They should have that power. And when that time comes, I think it is appropriate that they be allowed to seriously consider that and give him that opportunity." Counsel concluded by urging the court to impose the lesser sentence of "life with the possibility of parole."

The court declined to do so, however, and imposed life without possibility of parole. Although the judge agreed with Cox's counsel that Cox was not "a typical murderer," he noted that the crime was not "a typical murder." He further explained that "the nature of the killing itself, [Cox's] continuing indication to me that the problems have probably stemmed, in large part, from the use of crack cocaine continue to give real problems to [him] in understanding fully, or perceiving fully the real world as others perceive it." As a result, the judge concluded that Cox remained "a dangerous person." He told Cox that if he was "again going to see the light of day, . . . it should be more a matter for the Pardons Board rather than the Parole Board."

## C

Cox now seeks to overturn his sentence, claiming ineffective assistance of counsel. He argues that "[c]ounsel[ ] fail[ed] to put forth any effort to educate the court about Cox's true

psychiatric and behavioral condition and Cox's realistic expectations of improvement with appropriate treatment." In particular, he argues that counsel should have investigated and presented evidence of Cox's "serious mental problems," "severe cocaine addiction," and "how drug use interacted with Cox's mental illness," as well as evidence of "positive behavioral consequences if Cox received appropriate mental health care and drug rehabilitation opportunities." He objects that counsel offered no live witnesses, although expert witnesses "were readily available" and his counsel could have called "business associates who spoke well about Cox's character and work ethics [*sic*]."

1

**[8]** Cox's arguments are without merit, particularly viewed in light of AEDPA's deferential standard of review. First, he fails to show a failure to investigate. His counsel drew to the court's attention Cox's "mental problems," which were already documented by at least four psychiatrists. The detailed reports and the court's own investigation into Cox's competency to stand trial, *see supra* at 12232-34, did not suggest that additional research would have been fruitful. Nor did Cox present any specific background facts that counsel should have pursued. Counsel had no duty to present mitigating evidence that did not exist. Even on appeal, Cox does not say what evidence counsel could have found. Without any specification of the mitigating evidence that counsel failed to unearth, Cox's claim must fail. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

**[9]** In any event, our own search of the record shows that there was no "powerful" mitigating evidence left unearthed. *Wiggins*, 539 U.S. at 534. Cox "noted no significant problems during his childhood and/or adolescence." The troubles he had encountered in his adult relationships hardly suggested

mitigating circumstances: he had fathered two illegitimate children and married the mother of a third (but separated from her prior to the crime); none of the children or their mothers lived with him.[17] As for his drug use, Cox "denie[d] a problematic association with alcohol or illegal controlled substances" although he did "acknowledge weekly consumption of marijuana from age 20 until age 31 and recreational usage of cocaine from the early 1980's until December 1989."[18] These facts did not suggest that further investigation of Cox's life history would unearth mitigating evidence.

2

**[10]** Nor was counsel deficient for failing to emphasize Cox's limited criminal record. The Pre-Sentence Report ("PSR") already revealed that Cox "possesse[d] limited prior contacts within the criminal justice system" but that "*all of his prior contacts have been for violent crimes*." (emphasis added).[19] Defense counsel reasonably and presumably strategically chose to emphasize Cox's good behavior while incarcerated *after* the crime rather than draw further attention to Cox's prior record of limited but violent incidents.

---

[17]Ten years after the crime, his youngest son still did not know he was in prison and his wife had not visited him for the previous six years.

[18]A report commissioned by the Assistant Federal Public Defender in 2000 did not reveal further evidence. The report simply confirmed what psychiatrists had told the trial court: that Cox was "cooperative and candid" but had "illogical thought progressions that involved his cocaine use and the belief in a conspiracy against him" and "a delusional disorder, which is also known as a paranoid disorder." The report offered no new evidence of drug effects that counsel could have unearthed in 1990. *See supra* note 10 (describing the report).

[19]The PSR stated that Cox "voluntarily acknowledge[d] entering the juvenile justice system at approximately age 16 and sustaining three referrals for violent type offenses . . . . He entered the adult criminal justice system at approximately age 30, sustaining one misdemeanor conviction for a violent offense."

More troubling, but still not deficient, especially in light of Supreme Court precedent, was counsel's decision not to investigate or present additional evidence regarding Cox's use of drugs. The trial court had already ordered psychiatric reports from four doctors and impaneled two Sanity Commissions to ascertain Cox's mental state. These reports had revealed Cox's mental problems, but had also noted that he denied a drug problem and insisted that he only used cocaine in order to study its pernicious effects on others. In any case, counsel *did* argue that Cox's drug use affected his judgment, and the existing records did not alert him to a further need to investigate or present evidence on that score.[20]

[11] Furthermore, even if counsel could have discovered additional evidence regarding the influence of drugs upon Cox, no prejudice resulted. First, the judge considered Cox's drug use to be *aggravating* evidence, because he felt that the "use of crack cocaine continue[d] to give real problems to [Cox] in understanding fully, or perceiving fully the real world as others perceive it," and made him "a dangerous person." Offering further evidence of Cox's drug problem could have exacerbated the judge's view that he was dangerous.

[12] Second, Cox had continuously—and strenuously— protested when counsel suggested that his behavior was the result of drug use. Had his lawyer attempted to continue that line of argument, the record suggests that Cox would have stopped him. The Supreme Court recently held that no prejudice could be found in a case where the defendant had interrupted counsel in a similar manner. In *Schriro v. Landrigan*, 127 S.Ct. 1933, 1942 (2007), counsel had attempted to put a

---

[20]Cox admitted as much: In an amended state habeas petition, Cox alleged that "Counsel failed to attack the first degree murder charge by presenting evidence of Cox's cocaine use, even though the defense of voluntary intoxication was available to defeat the necessary intent element, *and even though counsel later argued these facts in hopes of mitigating the sentence imposed*."

positive spin on the defendant's actions, but every time he attempted to do so, the defendant interrupted and opposed the introduction of mitigating evidence. The Court held that counsel was not ineffective, even though he failed to present any mitigating evidence, because "regardless of what information counsel might have uncovered in his investigation, [the defendant] would have interrupted and refused to allow his counsel to present any such evidence." *Id.* The Court explained that prior precedent did not suggest otherwise:

> Neither *Wiggins* nor *Strickland* addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court. . . . [I]t was not objectively unreasonable for [the state] court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence.

*Id.* Under the Court's reasoning in *Landrigan*, as well as consideration of the judge's stated belief that Cox's drug use underscored his dangerousness, counsel's decision not to present further evidence of his drug use was not prejudicial.

3

Finally, Cox's argument that counsel should have sought out and presented witnesses at resentencing does not merit relief. Cox argues that his wife could have testified. But having her testify would have been a risky strategy, given that Cox and his wife were separated, she was raising his son without him, and by the time of resentencing, they had not seen one another for three years. Although we do not know the contents of her letter, we know that it was brief. It was not unreasonable to avoid the risk of having her cross-examined.

Cox also urges that counsel should have called his "business associates" to testify, rather than simply paraphrasing

their assertions that Cox was honest. But their live testimony would have done little to mitigate his culpability for the murder, which they expressly stated they could not understand (suggesting that they did not appreciate the dangerous aspects of his character). Furthermore, a decision to paraphrase the most positive statements made by Cox's associates falls within counsel's "wide latitude . . . in making tactical decisions." *Strickland*, 466 U.S. at 689.

Nor was it unreasonable for counsel to comment upon the expert statements in the record rather than call the experts to testify directly to the court. Cox offers no reason to believe that the court would have learned anything different or in addition to their reports, and he does not mention any expert who might have offered a new and more powerful mitigating argument. Even during habeas proceedings, Cox did not cite evidence that "should have been discovered" (beyond his general assertions that counsel should have investigated his mental problems and drug use further).

The record suggests no grounds for counsel to believe other witnesses were available who could have testified to Cox's reduced culpability or potential for rehabilitation. Indeed, during the trial Cox sought to speed up the proceedings, explaining that he was tired of the delay in his case and that no further investigation was needed because "the witnesses have *all been accounted for* that pertain to my case." (emphasis added). The Supreme Court has made clear that "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Strickland*, 466 U.S. at 691.

4

**[13]** In sum, after scouring the record for mitigating evidence that counsel failed to present—and in light of Cox's failure to present any such evidence on his own—we must

conclude that counsel's investigation was appropriate and reasonable in light of the facts and issues in this case and the applicable AEDPA deferential standard of review. Therefore, the Nevada Supreme Court's denial of relief, despite Cox's claim of ineffective assistance of counsel at resentencing, cannot be said to be "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." § 2254.

## IV

For the foregoing reasons, the decision of the district court denying federal habeas relief is

**AFFIRMED.**