**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RONALD L. SANDERS,
*Petitioner-Appellant*,

v.

RONALD DAVIS, Warden, San
Quentin State Prison,
*Respondent-Appellee*.

No. 17-16511

D.C. No.
1:92-cv-05471-
LJO-SAB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted June 25, 2021
Pasadena, California

Filed January 13, 2022

Before: M. Margaret McKeown, Richard A. Paez, and
Eric D. Miller, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Miller

## SUMMARY[*]

**Habeas Corpus/Death Penalty**

The panel reversed the district court's denial of habeas relief to Ronald Sanders, who was sentenced to death following his California state murder conviction; and remanded with instructions to issue a conditional writ of habeas corpus granting Sanders a penalty phase trial.

Sanders told his attorney, Frank Hoover, that he viewed a life without parole (LWOP) sentence as unacceptable and that he did not want Hoover to present a penalty defense. Viewing Sanders's objection as a personal choice that was not his role to challenge, Hoover presented no evidence and made no argument during the penalty phase. In this appeal, Sanders contended that Hoover rendered ineffective assistance at the penalty phase due to Hoover's failure to investigate mitigation evidence and properly inform and advise him about the penalty phase.

In *Schriro v. Landrigan*, 550 U.S. 465 (2007), the Supreme Court held that a defendant, who had objected to the presentation of mitigation evidence, could not establish that he was prejudiced by counsel's failure to conduct an adequate mitigation investigation. The panel recognized that although *Landrigan* involved the application of the restrictive standards prescribed by the Antiterrorism and Effective Death Penalty Act (AEDPA), which do not apply in this pre-AEDPA case, *Landrigan* informs the analysis of what Sanders must demonstrate to establish prejudice. The

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel adopted the Eleventh Circuit's approach, which explained that a defendant may establish prejudice even after he has threatened to obstruct the presentation of mitigation evidence, looking to whether the petitioner would have changed his directions to his counsel had counsel adequately fulfilled his duties in connection with the penalty phase.

The panel wrote that for a defendant to successfully mount a penalty-phase ineffective assistance of counsel claim based on insufficient mitigation investigation when *Landrigan* applies, the defendant must address two distinct deficient performance inquiries and two distinct prejudice inquiries. As for the deficient performance inquiries, a defendant must satisfy the traditional deficient performance question outlined in *Strickland v. Washington*, 466 U.S. 668 (1984), that counsel's performance in conducting the penalty phase investigation was deficient. Next, the defendant must show that counsel's deficient performance affected the defendant's decision not to present a penalty defense: here, the failure to adequately inform and advise Sanders in preparation for the penalty phase. As to the prejudice inquiry, the defendant must first show that there is a reasonable likelihood that he would have changed his mind and allowed the presentation of a mitigation defense had he been properly advised and informed. Second, he must also satisfy that the new mitigating evidence, if presented at trial, would have led the jury to return an LWOP sentence rather than death.

Applying this approach to Sanders's case, the panel concluded that Hoover performed deficiently in his penalty phase investigation by failing to perform even a rudimentary investigation into Sanders's social history and failing to obtain reasonably available records. The panel also concluded that Hoover failed to ensure that Sanders's

decision to forego a penalty phase defense was informed and knowing and that Hoover failed to adequately advise Sanders about the penalty phase over the course of his representation of Sanders, and thus performed deficiently. As to prejudice, the panel concluded that there is a reasonable likelihood that Sanders would have changed his mind had Hoover informed and advised him about the penalty phase, and that there is a reasonable likelihood that at least one juror would have changed her mind and voted to impose an LWOP sentence.

The panel held that the State forfeited any challenge to the district court's decision to vacate the second stage of the evidentiary hearing.

Judge Miller dissented. He agreed that Hoover's performance was deficient because he failed to investigate mitigating evidence. He also agreed that if mitigating evidence had been presented to the jury, at least one juror might have voted for life imprisonment. He wrote, however, that Sanders's theory of counsel's duty to ensure that Sanders's decision not to present a penalty phase defense was "informed and knowing" is contrary to Supreme Court precedent, and that Sanders did not show anything Hoover might have told him would have made any difference to his decision not to present a case of mitigation.

**COUNSEL**

Nina Rivkind (argued), Berkeley, California, for Petitioner-Appellant.

Lewis A. Martinez (argued) and Ryan McCarroll, Deputy Attorneys General; Louis M. Vasquez, Supervising Deputy Attorney General; Michael P. Farrell, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, Fresno, California; for Respondent-Appellee.

**OPINION**

PAEZ, Circuit Judge:

In 1982, Ronald Sanders was convicted for the murder of Janice Allen and sentenced to death following a jury trial. Sanders's attorney, Frank Hoover, had never represented a capital defendant before and conducted a minimal penalty phase investigation. Sanders told Hoover that he viewed a life without parole ("LWOP") sentence as unacceptable and that he did not want Hoover to present a penalty defense. Viewing Sanders's objection as a personal choice that was not his role to challenge, Hoover presented no evidence and made no argument during the penalty phase.

In this appeal, Sanders challenges the district court's denial of his habeas petition under 28 U.S.C. § 2254 following an evidentiary hearing. He contends that Hoover rendered ineffective assistance of counsel at the penalty phase due to Hoover's failure to investigate mitigation

evidence and properly inform and advise him about the penalty phase.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). In this pre-Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (1996) ("AEDPA") case, we reverse and remand. We conclude that Hoover's minimal mitigation investigation and his failure to adequately inform and advise Sanders about the penalty phase constituted deficient performance. We further conclude that Hoover's deficient performance prejudiced Sanders, because there is a reasonable likelihood that Sanders would have allowed the presentation of a penalty defense had Hoover reasonably informed and advised him, and because there is a reasonable likelihood that at least one juror would have changed her mind and voted to impose an LWOP sentence.

## I.

## A.

We briefly recite the facts of the crime. In doing so, we draw from the California Supreme Court decision affirming Sanders's conviction on direct appeal. *See People v. Sanders*, 797 P.2d 561, 565–67 (Cal. 1990).

On January 21, 1981, Sanders participated in a botched attempt to rob a couple, Dale Boender and Janice Allen, in Bakersfield, California. 797 P.2d at 565–66. Boender made a living selling cocaine and marijuana, and had previously sold drugs to an acquaintance of Sanders, Brenda Maxwell. *Id.* at 565. Maxwell, her aunt Donna Thompson, and Sanders launched a plan to rob Boender of money and drugs. *Id.* Boender and Allen arrived at Maxwell's home to make a sale, but when the two entered, Sanders began beating

Boender with a piece of a pool stick. *Id.* at 566. Boender and Allen escaped. *Id.* After staying with a relative for two days, Boender and Allen returned to their apartment and told their roommates about the assault at Maxwell's home. *Id.*

Meanwhile, Sanders was concerned that Boender would identify him, and Maxwell was concerned that Boender would recognize that she had set him up. *Id.* The two discussed these concerns with each other. *Id.* They picked up another person, John Cebreros, and then headed to Thompson's home. *Id.* While at Thompson's home, Maxwell made calls to people that both she and Boender knew and claimed that she had been victimized along with Boender. *Id.*

Around dinnertime on January 23, 1981, the day Boender and Allen returned to their apartment, Boender opened the door to his apartment when he heard a knock and saw Cebreros and Sanders at the door. *Id.* Sanders was armed with a gun and pushed Boender to the ground. *Id.* Boender and Allen were bound and blindfolded. *Id.* One of the assailants asked Boender where he kept his cocaine and removed money from Boender's pocket. *Id.* Boender also heard rummaging around the apartment, muffled talking (including one of the assailants saying he wanted to leave), and banging noises. *Id.* Boender was dragged to a different room and felt a blow to the head, after which he could not recall anything more. *Id.*

Boender's roommates returned home early the next morning and found Allen's dead body and Boender lying in a pool of blood. *Id.* Allen and Boender had been bound with electrical cord. *Id.* Boender had suffered a skull fracture but was conscious when police arrived. *Id.* Allen died from a head wound that fractured her skull and lacerated her brain. *Id.* The police arrested Sanders and Cebreros and, among

other charges, they were charged with the murder of Allen and the attempted murder of Boender.

## B.

Following Sanders's arrest, a Kern County court clerk asked local attorney Frank Hoover to represent Sanders.[1] Hoover initially declined the appointment due to his lack of experience representing capital defendants. Hoover later accepted the appointment, after an attorney with capital defense experience had been appointed to represent Cebreros.[2]

Hoover had little experience as defense counsel in serious felony cases and little knowledge of the penalty phase of a capital case. After graduating from law school in 1972, Hoover joined the Kern County District Attorney's office. Hoover tried numerous felony cases as a deputy district attorney. He worked on several homicide cases while at the office, but never tried a capital case. After leaving the District Attorney's office, he entered private practice and worked primarily on business litigation and real estate development. He eventually began to accept criminal cases, and characterized the cases he worked on as "[s]imple, easy, petty thefts, drunk driving, assault and battery, [and] prostitution." Once he began working on Sanders's case, Hoover did not seek out training on defending a capital case, although such training was available.

---

[1] In summarizing the events following Hoover's appointment, we rely on the district court's factual findings and other evidence presented in the federal habeas proceedings.

[2] Attorney James Faulkner initially represented Cebreros, and was later replaced with Stanley Simrin.

Early in his preparation for trial, Hoover retained the services of Dodd Investigations and Security ("Dodd"). Dodd was owned by a "good friend" of Hoover who had helped Hoover "get . . . start[ed] in the whole law enforcement business." When Hoover retained Dodd, he did not know whether Dodd had any experience in conducting investigations for the penalty phase of a capital case. Hoover did not provide Dodd with any specific directions for its investigation.

In one of Hoover's first interviews with Sanders, Sanders provided false information about his background. Sanders told Hoover that he had no criminal history and that he had a master's degree in petroleum geology. Prior to trial, the prosecutor disclosed Sanders's involvement in multiple robberies in 1970, one of which resulted in a 1971 Orange County armed robbery conviction. This disclosure surprised Hoover, who then asked Dodd to look into Sanders's past arrests and convictions in Orange County. Although Dodd identified the witnesses and Sanders's accomplices in those cases, neither Hoover nor Dodd interviewed them.

Hoover focused his investigation and trial preparation on the guilt phase. He told Sanders that "[the] case was remarkably weak for a first-degree death prosecution." Hoover's assessment was based on the lack of physical evidence tying Sanders and Cebreros to the crime, as only the testimony of two unreliable witnesses, Boender and Maxwell, provided the link. In contrast, Cebreros's attorney, Stanley Simrin—an experienced capital defense attorney— began his preparations for the guilt and penalty phases well before the trial began. He worked closely with his investigator, Roger Ruby, on the penalty phase investigation.

At some point before trial, Sanders informed Hoover that he was opposed to an LWOP sentence.  Sanders did not want to be executed, but also found LWOP unacceptable and opposed requesting such a sentence.  Hoover later testified at the evidentiary hearing that "[Sanders] wanted [him] to work on the case and get an acquittal, which is what [Sanders] felt the evidence should get for him," and that "[Sanders] did not want [him] to do anything that would result in a sentence of life without the possibility of parole." Hoover testified that he did not believe it was his role to change Sanders's mind and that he did not try to change Sanders's mind.  As the trial approached, Hoover believed that Sanders would resist the presentation of a penalty defense if he were convicted of capital murder, but Hoover was not worried about Sanders's opposition to a penalty phase defense because he believed acquittal was likely.

The trial ended on August 3, 1981 with a divided jury: eleven to one in favor of a guilty verdict for Sanders and Cebreros on all counts.  The court scheduled a retrial in late November 1981.  Despite the outcome of the first trial, Hoover continued to devote a "hundred percent of [his] energy" to prevailing at the guilt phase of the retrial because he believed the prosecution's case was weak.

At the second trial, the prosecution presented testimony from Maxwell and Boender, as well as physical evidence and other testimony.  Forensic experts testified that Sanders's fingerprints had been found on a roll of duct tape in Maxwell's home.  Boender's neighbors testified to hearing noises coming from his apartment that evening, between 8:15 p.m. and 10:00 p.m.  The coroner testified to the extent of the damage to Allen's skull, including "the large amounts of blood and brain matter" exposed on her head.  Police officers testified that Maxwell and Boender identified

Sanders and Cebreros in photographic lineups.  A friend of Maxwell's testified that she had seen Thompson (Maxwell's aunt) and Sanders at Maxwell's home on January 21, 1981, the night of the botched robbery.  A detective testified that Sanders said that he had been at Thompson's house with his wife between 4:00 p.m. and 6:00 p.m. on the night of Allen's murder, and that he had stayed home with his wife for the rest of the evening because he had been sick with the flu.

The defendants presented their own witnesses. The police officer who first interviewed Boender testified that Boender had said he was not familiar with the men who beat him.  Similarly, the paramedic who treated Boender in the ambulance testified that Boender had also said that he had never seen the men before.  A criminalist testified that there was no blood, hair, or fiber evidence connecting the defendants to the crime scene.   Allen's grandmother provided an alternative motive for the killing, testifying that Allen had said on January 21 that Boender had been beaten with a pipe in a parking lot by three men to whom he owed money.  Cebreros's brother, Cebreros's brother's on-and-off girlfriend, and Cebreros's roommate testified that Cebreros and Sanders had spent the evening and the night of Allen's murder drinking beer and playing chess at Cebreros's brother's home.  Boender's neighbors testified to seeing two men they were unfamiliar with, who were not Cebreros or Sanders, around Boender's apartment on the night of Allen's murder.  Sanders's brother, brother-in-law, and his brother-in-law's brother testified that Sanders had used duct tape from Maxwell's home to tape shut a stove they had moved from her place.

On January 22, 1982, the jury returned its verdicts, finding Sanders and Cebreros guilty of the murder of Allen in the first degree with all four charged special

circumstances,[3] as well as the robbery, burglary, and attempted murder of Boender. The jury also found Sanders guilty of the January 21, 1981, attempted robbery. Both Sanders and Hoover were shocked by the guilty verdicts. For Sanders, the guilty verdicts made him feel like he "was in a mine that collapsed around [him], and [he] was suffocating." The penalty phase was scheduled to start four days later on January 26, 1982.

Following the guilty verdicts, Hoover asked Dodd to conduct a limited investigation of mitigating evidence for the penalty phase. Dodd prepared a summary of Sanders's education and employment, based on information obtained from Sanders, including from papers located at Sanders's house. The one-page summary provided a list of Sanders's former employers and noted that Dodd was unable to corroborate Sanders's statement that he attended college in Canada. Dodd contacted one of Sanders's prior employers, but "[t]hey said nothing good, all bad." A few weeks earlier during the guilt phase, Dodd located Sanders's father at Hoover's request, but Dodd did not interview him. In fact, neither Hoover nor Dodd interviewed anyone about Sanders's background in preparation for the penalty phase.

Hoover also spent this four-day period discussing with Sanders his objection to presenting a penalty phase defense. Sanders continued to object. He told Hoover that if he were to receive an LWOP sentence, he "would climb a prison wall so the guards would shoot him trying to escape." Hoover

---

[3] The four charged special circumstances alleged that the murder was (1) committed during the commission of a robbery, (2) committed during the commission of a burglary, (3) committed for the purpose of preventing Allen, a witness to a prior crime, from testifying at a future criminal proceeding, and (4) "especially heinous, atrocious, and cruel."

mentioned to Sanders that the judge could order him to present a penalty defense over Sanders's objection. In response, Sanders said "you gotta do what you gotta do, and I'll do what I gotta do." Hoover interpreted this to mean that Sanders would speak out during the penalty phase if Hoover attempted to present mitigating evidence. During the period between the guilt and penalty phases, Hoover did not inform Sanders of what mitigation evidence could be presented, partially because Hoover "wasn't sure" how he would frame any arguments for an LWOP sentence.

Hoover also sought to verify that Sanders's resistance to life without parole was not due to advice from jailhouse lawyers. After raising this concern with the court, the court continued the penalty phase from January 26, 1982 to February 1, 1982. The court appointed Dr. Francis Matychowiak to evaluate whether Sanders was competent to make a decision about the penalty phase. After meeting with Sanders, Dr. Matychowiak opined that Sanders had the "capacity to understand the nature and purpose of the proceedings in court and [was] presently able to cooperate in a rational manner with counsel in presenting a defense." The court also appointed attorney Robert Cook, an experienced criminal defense lawyer, to evaluate whether Sanders had been influenced by jailhouse lawyers. After Cook met with Sanders, he told Hoover that Sanders "was serious about his decision and was not gaming the system to set up an appeal." But Cook informed the court that "there was some ambivalence" in Sanders's feelings.

Hoover also arranged for Sanders's parents to speak with Sanders about his decision. Although Sanders objected to meeting with his parents, he met with them at Hoover's request. Hoover did not explain the nature of the penalty phase to Sanders's parents nor ask them to try to change

Sanders's mind; instead, Hoover wanted to know if Sanders was serious about his decision, which they reported he was. Hoover did not attend the meeting with Sanders and his parents, but the meeting was, according to Sanders's brother who heard about the meeting from his father, a disaster as his parents "picked an old fight from the divorce they hadn't finished."

On February 1, 1982, Hoover requested a second continuance to "allow [him] more opportunity to try to consult and counsel Mr. Sanders to get him to change his essential position," but the court denied the motion. Sanders told the judge that he did not want Hoover to present any evidence, ask any questions of the witnesses called by the prosecution, nor make a statement to the jury.[4] He did not want the jury to come back with an LWOP sentence nor a death penalty sentence. Instead, he wanted to leave the courtroom and go home even though he knew that was not possible. Hoover informed the court that Sanders's "mother, his father, his grandmother and his sister are all here in this courtroom" and that he could "put on the evidence," but that he wished to respect Sanders's sincere wishes. Hoover had not, however, interviewed any of Sanders's family, and admitted during federal habeas proceedings that if Sanders had changed his mind he would have "become very, very nervous because [he] hadn't done anything to prepare for one."

At the penalty phase, the prosecution presented testimony from witnesses to the Orange County robberies

---

[4] Sanders initially informed the court that he did not want Hoover to ask any questions of witnesses called by the prosecution, but later said that he wanted Hoover to make objections during the prosecutor's presentation.

Sanders committed in 1970 as well as testimony from police officers who arrested and interviewed him. None of the victims was hurt during the course of the robberies, but, in two of them, one of the robbers threatened to harm the victims if they moved or called the cops. In his closing argument, the prosecutor stressed that the jury instructions required the jury to impose the death penalty if the aggravating circumstances outweighed the mitigating circumstances. Hoover did not present any evidence, so there were no mitigating circumstances to weigh. The prosecutor argued that because there were aggravating circumstances and no mitigating circumstances, "the proper sentence" was death. The judge instructed the jury that "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death."

During the course of deliberations, the jury sent the court two notes. First, they asked "What are the consequences if the jury is unable to arrive at a unanimous decision?" The court replied that the jury should not consider the consequences of failing to arrive at a decision but that the jury's decision had to be unanimous. Second, the jury asked for a copy of the jury instructions, which the court provided. Thirty minutes later, the jury returned its verdict—death.

## C.

On direct appeal, the California Supreme Court invalidated two of the jury's four special circumstance findings.[5] *People v. Sanders*, 797 P.2d at 586. The

---

[5] The court invalidated the "heinous, atrocious, and cruel" and burglary-murder special circumstance findings. 797 P.2d at 589. The

California Supreme Court affirmed the death sentence, however, because it concluded that Sanders was not prejudiced by the consideration of the additional special circumstance findings. *Id.* at 590.

In 1993, Sanders filed a federal habeas petition, and the district court ordered him to exhaust his state remedies for certain claims. *Sanders v. Woodford*, 373 F.3d 1054, 1058 (9th Cir. 2004), *overruled by Brown v. Sanders*, 546 U.S. 212 (2006). The California Supreme Court denied his state habeas exhaustion petition in 1999. *In re Sanders*, No. S043131, 1999 Cal. LEXIS 6112 (Cal. Sept. 1, 1999). Thereafter, Sanders filed an amended petition raising numerous claims, which the district court ultimately denied in 2001. *Sanders v. Woodford*, No. Civ. F-92-5471-REC-P, 2001 WL 34882452 (E.D. Cal. Aug. 24, 2001). We reversed and remanded for a new penalty phase trial, concluding that the jury's consideration of the two invalid special circumstances was not harmless. We therefore did not address Sanders's other penalty phase claims, including ineffective assistance of counsel (Claim 38). *Sanders v. Woodford*, 373 F.3d at 1067–68.[6]   The Supreme Court reversed, holding that "the jury's consideration of the invalid 'special circumstances' gave rise to no constitutional violation." *Brown v. Sanders*, 546 U.S. at 225. The Court remanded for consideration of Sanders's remaining penalty phase claims.

---

court upheld the robbery-murder and witness-killing special circumstance findings. *Id*. at 586–89.

[6] We affirmed the district court's denial of the habeas petition as to Sanders's guilt phase claims. *Sanders v. Woodford*, 373 F.3d at 1070–71.

On remand, we held that Sanders was entitled to an evidentiary hearing on his penalty phase ineffective assistance of counsel claim (Claim 38). *Sanders v. Brown*, 171 F. App'x 588, 595 (9th Cir. 2006). Specifically, we noted that "[t]he facts of Sanders' opposition to presenting mitigating evidence are not entirely clear on [the] record," and that "we have little evidence as to how adamant Sanders' refusal was and little evidence that a background investigation by Hoover would have failed to change Sanders' mind." *Id.* at 594. We remanded to the district court for an evidentiary hearing.[7] *Id.* at 595.

## D.

On remand, the district court bifurcated the evidentiary hearing. The first stage would concern deficient performance, i.e., "whether counsel's decision not to investigate mitigation evidence was deficient." The second stage would evaluate prejudice, i.e., "whether, had [Sanders] changed his mind, the mitigation evidence would have convinced the jury to sentence him to life without parole."

The district court conducted the first stage of the evidentiary hearing in 2008. The evidence that Sanders presented at the hearing took two general forms:

---

[7] Sanders argues that our decision on remand from the Supreme Court held that he established that Hoover's investigation was deficient, and that the law-of-the-case doctrine precluded the district court from revisiting that issue on remand. The question we addressed on remand from the Supreme Court, however, was whether Sanders had raised a colorable claim of ineffective assistance of counsel and was thus entitled to an evidentiary hearing, not whether he had established that his counsel was ineffective at the penalty phase. *Sanders v. Brown*, 171 F. App'x at 591; s*ee also United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995) (holding that the law of the case doctrine only applies "when the issue in question was actually considered and decided").

(1) mitigation evidence that Hoover could have discovered and presented at the penalty phase in 1982, and (2) evidence, including expert testimony, that Hoover performed deficiently at the penalty phase.**[8]** Some of the proffered mitigation evidence and expert testimony also related to whether Hoover had a duty to inform or advise Sanders about the nature of the penalty phase, what information or advice he did provide, and whether there was a reasonable possibility Sanders would have changed his mind and presented mitigation evidence and argument.

Sanders's family and friends testified and provided declarations concerning Sanders's upbringing and his relationships with his family.**[9]** The home Sanders grew up in was, according to a neighbor and family friend, both "physically and emotionally" chaotic. Sanders's parents were heavy drinkers, frequently had arguments (which sometimes turned physical), and divorced when Sanders was young. His father moved out of state, and in the ensuing years the children moved in between their parents, grandparents, and aunts and uncles, never living in one place for long and often being split apart from each other. The children had little adult supervision, and because money was tight there was also little food in the home.

---

**[8]** In reciting the evidence from the evidentiary hearing, we draw from the district court's factual findings and the evidence at the hearing. The State did not contest the evidence beyond introducing portions of Hoover's deposition. The district court took the evidence presented at the hearing as true when deciding the issue of prejudice.

**[9]** The testimony and declarations were extensive. We therefore provide only a summary of the evidence and do not detail all of the adverse childhood experiences Sanders experienced.

After the divorce, Sanders's father did not provide child support, and his mother worked long hours, leaving little time for her to spend with the children. As they grew older, Sanders's mother noted that her "kids knew more about what was going on with each other than [she] did." Sanders's mother also battled depression throughout her life, which led her to isolate and withdraw from her family during major depressive episodes and attempt suicide.

The Sanders children were subject to repeated physical abuse from their parents, with Sanders receiving more frequent beatings. Family members said that Sanders was a protective brother who took the blame for his siblings and stood up for them when they were picked on, which led to some of the additional beatings. As Sanders's brother Donald Sanders described the beatings, "it felt like we were beaten over and over again just for being alive." Family members also observed that Sanders was hyperactive, and was punished for his hyperactivity even though he could not control it.

Sanders also suffered two instances of head trauma. As a child, he had a serious bicycle accident for which he was hospitalized. At 18, Sanders was attacked by a group of bikers, who reportedly beat his head with baseball bats and chains. Sanders was hospitalized, his face became disfigured and swollen, and he "experienced blackouts, headaches and memory impairment for about a year after the attack."

The Sanders children began using drugs as children and teenagers, with Sanders starting to use drugs and alcohol around age thirteen. Alcoholism ran in the family, and Sanders's mother and father both had a history of substance abuse.

Family and friends would have also been available to testify to efforts Sanders made to help his family as an adult. Arlene Fangmeyer, who in the 1970s dated Sanders's cousin Gary, was available to explain how Sanders supported her when her relationship with Gary was falling apart. Arlene explained that "[Sanders] was the person I turned to in times of need," and that he would pay for her young daughter's medication and medical bills when she could not afford to do so. Sanders was also very close with his maternal grandmother—who considered him her favorite grandchild—and took pride in learning about her Native American heritage. Sanders looked out for his younger brother, Roger, and put up his own money to post bail for Roger when he was arrested for drunk driving just days after the murder for which Sanders was convicted.

Sanders also presented evidence that could have mitigated his prior robbery conviction and his involvement in other robberies. Sanders's accomplices in the 1970 robberies provided declarations explaining that they committed the robberies to get money to buy drugs, that they were all using a lot of drugs during that period of time, and were high at the time of the robberies.

Sanders also presented extensive record evidence. The available school records corroborated the family's account that Sanders moved around repeatedly as a child, and thus frequently changed schools. There were records from the California Youth Authority, although some records were destroyed seven years after his discharge from the military in 1971, well before the 1982 trial.[10] Sanders also presented

---

[10] Sanders was taken into custody at age thirteen for being "incorrigible" and placed at the David R. McMillan School, from which

documentary evidence about his brief military service.[11] Additionally, Sanders introduced police records related to his robbery conviction, and related records from the Orange County Public Defender's office, which represented him.

Sanders also presented prison records from the institution where he served his sentence for the robbery conviction, which included information about his positive adjustment to prison. The records noted that Sanders was "respectful towards staff at all times," and had "a good attitude getting along well with everyone." One supervisor commended Sanders for "accept[ing] responsibility unhesitantly" and for his "resourceful approach." A psychiatrist noted that Sanders's "adjustment and behavior, within the institutional setting, has been quite good," with few violations of prison rules.

Further, Sanders presented the declarations of a psychiatrist and two psychologists, with whom he met before the evidentiary hearing. They also reviewed Sanders's records and supporting declarations. In reviewing family records and declarations, psychologist Nell Riley, Ph.D., noted "an unusually high prevalence of mental illness and learning disabilities" in Sanders's family, including "dyslexia, mood disorders including depression, as well as chronic alcoholism and substance abuse." Dr. Riley concluded that the records she reviewed and her assessment of Sanders indicated a diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"). Psychiatrist Pablo

---

he ran away and was subsequently placed in the California Youth Authority.

[11] Sanders enlisted under his older brother's name at age 16, and the Army discharged him when they learned he was underage.

Stewart, M.D., concurred in Dr. Riley's assessment, and also noted that Sanders met the diagnostic criteria for Post-Traumatic Stress Disorder ("PTSD") and Mixed Substance Abuse and Dependence.

These experts also provided an extensive social history of Sanders, linking his childhood and adolescent experiences, and family history, with his development. Dr. Kriegler summarized that Sanders "was born into a family with an extensive history of trauma, poverty, mental illness, neuropsychiatric impairments, and relational dysfunction," and that "the Sanders children were not provided with the basic level of safety that was needed to facilitate their psychosocial development in a positive direction." Sanders bore a toll greater than his siblings because "he tended to take the blame for the misdeeds of others," and "like many disabled or behaviorally disturbed children, served as the family scapegoat." When the parents divorced, "the Sanders children's living situation continued to become more and more chaotic and stressful as they would be passed around between multiple homes and be exposed to ongoing and increasing levels of intrafamilial violence and mental illness compounded by ongoing socioeconomic stress."

Dr. Kriegler also connected Sanders's past trauma to his stated opposition to a life without parole sentence and presenting a penalty defense. Dr. Kriegler explained that Sanders's ability to make decisions was constrained by the effects of the "extreme family dysfunction," and that given those dynamics Sanders "needed someone to help [] him try to understand the factors contributing to his views about the penalty phase, so he could move beyond his 'stuck' position and consider what course of action was in his best interest."

Similarly, the psychiatry and psychology experts also explained how Sanders's neurocognitive deficits may have contributed to his resistance to life without parole.[12] Dr. Stewart explained that "neuropsychological testing show[ed] impairments in his ability to organize and regulate his behavior in relation to external factors, to control or override his impulses in making decisions, and . . . to modify his problem-solving and envision new approaches." Further, Dr. Stewart explained that "Sanders's cognitive impairments . . . prevented him from understanding that he did not have the option of simply doing nothing." Dr. Kriegler explained that these deficits meant that on his own "[i]t was not likely that [Sanders] would be able to envision alternative ways to approach and analyze his objection to a sentence of LWOP and to presenting [sic] mitigating evidence, particularly after sitting with his own views for many months without discussing them thoroughly."

Sanders's past trauma also affected how he dealt with overwhelming situations, like the guilty verdict. Dr. Stewart explained that "Sanders's experience of [] overwhelming psychological stress was expressed in somatic symptoms," which likely caused "Sanders to shut down emotionally and become cognitively flooded, significantly impeding his ability to make a rational decision about the penalty phase." Similarly, Dr. Kriegler explained that the surprise of a guilty verdict and Sanders's existing "difficulties in executive functioning including response flexibility . . . seriously

---

[12] These experts also cabined the role of Dr. Matychowiak's pre-penalty phase examination of Sanders, with Dr. Kriegler explaining that the examination "was explicitly limited to assessing for overt signs of mental conditions that could have prevented [Sanders] from rationally participating in his defense. Dr. Matychowiak did not attempt to diagnose other conditions and did not have the necessary psychosocial data to do so."

imped[ed] his ability to rationally consider and decide whether LWOP and presenting a penalty defense would be in his best interest."

Dr. Kriegler and Dr. Stewart opined, though, that Sanders's deficits did not make his objection to life without parole insurmountable. Dr. Stewart pointed to prison records that described Sanders as "easily led" and influenced by those in authority, suggesting that Sanders may have deferred to the authority of his trial counsel. Dr. Kriegler explained that trial counsel "could have helped [Sanders] clarify his reactions to the idea of a penalty phase and establish the sense of trust and safety necessary for [Sanders] to go forward with a penalty defense without compromising his expressions of innocence."

Sanders also presented testimony and declarations from three capital defense penalty phase experts, who all opined that Hoover's investigation efforts fell below professional standards at the time of the 1982 trial. Susan Sawyer, the former penalty phase coordinator for the Alameda County Public Defender's office, described the importance of the penalty phase and the resources available to attorneys at the time of Sanders's trial to learn about the importance of mitigation evidence. Stanley Simrin, the attorney for Sanders's co-defendant, submitted a declaration and testified about his representation of Cebreros, his observations of Hoover's representation, and his expert opinion on the standards applicable at the time. Russell Stetler, a mitigation expert, explained the standards for mitigation investigations in 1981–82 and his experience in preparing capital defendants for the penalty phase of their trials.

The experts explained that properly addressing concerns about an LWOP sentence requires early and proactive conversations with the defendant. Sawyer explained that

because the idea of LWOP is "terrifying" to many defendants, "[i]t takes time – sometimes many, many months or even longer – [for a client] to adjust to [the] reality [of LWOP]. And often a client needs his attorney's, his family's or a friend's help to come to terms with that reality." Similarly, Simrin explained that Hoover needed to "address[] Mr. Sanders'[s] view forcefully when it first arose," instead of waiting until the last minute.

The three experts also described in their declarations how common it is for a client to resist life without parole and how often a client will change his mind. Stetler explained that "[a]lmost every capitally charged defendant" he knew at some point expressed a preference to die rather than spend life in prison, and that "[v]irtually all capital clients at the outset want to cling to the hope that the charges are all a bad dream and they will somehow go away." Stetler also explained that in 1982, experienced capital defense attorneys "knew that defendants in capital cases often rejected and then had a difficult time coming to terms with the idea of an LWOP sentence." Sawyer explained that 70% of death-eligible clients she interviewed initially said they would prefer death to LWOP, and thus did not want to present mitigating evidence, but that every one of her clients who initially expressed this position ended up changing their minds. Simrin had eight clients who said they preferred death to LWOP, and all eight changed their minds. All three experts opined that there was a strong likelihood Sanders would have changed his mind if Hoover had competently represented him in preparation for the penalty phase.

The State did not present any witnesses at the evidentiary hearing, but did introduce portions of Hoover's deposition. Years after the conclusion of the first stage of the evidentiary hearing, the district court in 2015 and 2016 directed the

parties to file supplemental briefs addressing two issues: the impact of *Schriro v. Landrigan*, 550 U.S. 465 (2007), and whether the mitigation evidence presented at the first stage of the evidentiary hearing, taken as true, would have convinced at least one juror to sentence Sanders to life without parole rather than death.

In June 2017, the district court denied Sanders's claim of ineffective assistance of counsel and vacated the second stage of the evidentiary hearing. The district court ruled that in light of Sanders's "refusal to cooperate in and obstruction of the defense," Hoover's limited investigation was not deficient. Further, the district court held that *Landrigan* precluded Sanders from establishing prejudice because Sanders "engaged in active interference of the penalty defense." The district court also concluded that even if *Landrigan* did not bar Sanders from establishing prejudice, the proffered mitigating evidence had "only minor mitigating value relative to the totality of evidence developed in the record," and thus Sanders "ha[d] not demonstrated a reasonable likelihood that the sentencing verdict would have been different absent Hoover's alleged deficiencies."

## II.

Because Sanders filed his habeas petition before the effective date of AEDPA, pre-AEDPA law governs our review of Sanders's claim. *Brown v. Sanders*, 546 U.S. at 215 n.1. Under pre-AEDPA law, we consider a claim of ineffective assistance of counsel to be a mixed question of law and fact, and we review de novo. *Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005) (en banc). We review the district court's findings of fact for clear error. *Id.*

## III.

## A.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must show that his trial counsel's performance was deficient and "that the deficient performance prejudiced the defense." *Id.* at 687. A deficient penalty phase investigation may form the basis of an ineffective assistance of counsel claim. *See id.* at 690. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Counsel's "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

When a defendant objects to the presentation of a mitigation defense, however, the process outlined in *Strickland* takes on an additional consideration. In *Schriro v. Landrigan*, 550 U.S. 465 (2007), the Supreme Court held that the defendant, who had objected to the presentation of mitigation evidence, could not establish that he was prejudiced by counsel's failure to conduct an adequate mitigation investigation. Although *Landrigan* involved the application of AEDPA's restrictive habeas standards, which do not apply here, we recognize that *Landrigan* informs our analysis of what Sanders must demonstrate to establish prejudice. *See* 28 U.S.C. § 2254(d).

In *Landrigan*, counsel "had carefully explained to Landrigan the importance of mitigating evidence," *id.* at 479, yet Landrigan refused to allow the presentation of mitigation evidence. Counsel had attempted to present testimony from two women—Landrigan's ex-wife and birth

mother—but Landrigan instructed both women not to testify. *Id.* at 469. Landrigan interrupted his attorney's attempt to proffer to the court what mitigating evidence the women would have testified to, and informed the court "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id.* at 470. The Supreme Court explained that because Landrigan objected to the presentation of mitigation evidence, "counsel's failure to investigate further could not have been prejudicial under *Strickland.*" *Id.* at 475.

We have previously identified situations in which a defendant's limited resistance to presenting a penalty phase defense did not require application of *Landrigan*'s prejudice holding. Distinguishing the defendant's actions in *Landrigan*, we have held that the *Landrigan* prejudice holding does not apply when the defendant "did not threaten to obstruct the presentation of any mitigating evidence." *Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009); *Stankewitz v. Wong*, 698 F.3d 1163, 1170 n.2 (9th Cir. 2012) ("*Stankewitz II*") (concluding that *Landrigan* did not apply because the defendant "did not interrupt or try to sabotage trial counsel's presentation"). Similarly, the Third Circuit has held that *Landrigan* does not apply when the defendant opposes only the introduction of certain kinds of mitigation evidence. *See Blystone v. Horn*, 664 F.3d 397, 426 (3d Cir. 2011); *Thomas v. Horn*, 570 F.3d 105, 128–29 (3d Cir. 2009).

Here, the district court found that "the record suggests Petitioner's penalty objection had a broad sweep," and that Hoover believed that Sanders "was determined to foul up any penalty defense by being demonstrative, standing up in court and acting out so that the jury would not be sympathetic toward him." This factual finding that Sanders

threatened to obstruct the penalty phase, and that Hoover took the threat seriously, is not clearly erroneous. Thus, Sanders's opposition to the entire penalty phase resembles the defendant's opposition in *Landrigan* more than the limited objections present in *Hamilton* or *Stankewitz II*.

However, as the Eleventh Circuit has explained, in certain circumstances a defendant may establish prejudice even after he has threatened to obstruct the presentation of mitigation evidence consistent with *Landrigan*. *See Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1359–60 (11th Cir. 2009); *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1265–67 (11th Cir. 2014); *Krawczuk v. Sec'y, Fla. Dep't of Corr.*, 873 F.3d 1273, 1294–96 (11th Cir. 2017); *see also Gilreath v. Head*, 234 F.3d 547, 551–52 (11th Cir. 2000) (establishing, pre-*Landrigan*, a framework for demonstrating ineffective assistance of counsel when a defendant opposes the presentation of a penalty defense). The Eleventh Circuit has explained that a habeas court must determine whether an obstructionist defendant "would have refused to permit the introduction of mitigation evidence *in any event*," *Cummings*, 588 F.3d at 1360 (emphasis added). This determination is necessary to assess prejudice, meaning the prejudice prong includes two separate legal inquiries.

> [A] petitioner who has told trial counsel not to present mitigation evidence must show a reasonable probability that, if he had been more fully advised about the mitigating evidence and its significance, he would have permitted trial counsel to present the evidence at sentencing. Beyond that, the petitioner must also establish that this new mitigating evidence, if heard by the jury,

> would have with a reasonable probability led
> the jury to recommend life instead of death.

*Pope*, 752 F.3d at 1266 (citing *Gilreath*, 234 F.3d at 551–52).

Post-*Landrigan*, we have not yet been presented with a case that implicates *Landrigan*'s prejudice holding. We are persuaded by the Eleventh Circuit's reasoning and adopt its approach when reviewing cases that fall within the ambit of *Landrigan*, such as this one.[13]

This approach is consistent with *Landrigan*, which addressed whether the discovery of additional mitigation evidence alone would have caused Landrigan to change his mind about the penalty phase. Of paramount concern to the Supreme Court in applying AEDPA's deferential habeas standards was the district court's finding that "regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence." 550 U.S. at 477. Thus, the Court concluded, "Landrigan could not demonstrate prejudice under *Strickland*." *Id.*

In *Landrigan*, however, the Supreme Court did not address whether counsel's professional obligations beyond

---

[13] We agree with Judge Martin's concurrence in *Krawczuk* that "*Landrigan* did not, however, establish a rule that if any defendant tells his lawyer he wants no mitigation evidence presented, he can never establish prejudice under *Strickland v. Washington* unless he satisfies the two-part standard required [by the Eleventh Circuit]." 873 F.3d at 1301 n.2 (Martin, J., concurring) (internal citation omitted) (citing the Third Circuit's decision in *Blystone*, 664 F.3d at 424–26, which held that *Landrigan* did not apply when a defendant objected only to the presentation of testimony from family members).

conducting a competent mitigation investigation could have changed his client's mind.[14]   We have repeatedly ascribed duties related to the penalty phase beyond the duty to investigate mitigating evidence, including the duty to inform and advise a client in preparation for the penalty phase trial, which we discuss in Part III.C., *infra*.  Under *Landrigan*, the failure to uncover mitigating evidence cannot alone establish prejudice when a defendant objects to presenting mitigation evidence, but *Landrigan* does not preclude a defendant from establishing that had counsel not performed deficiently in other respects, he would have changed his mind.  We cannot summarily conclude that "the defendant would have refused to permit the introduction of mitigation evidence *in any event*," *Cummings*, 588 F.3d at 1360 (emphasis added), when a defendant alleges that counsel deficiently performed in other respects that could have influenced his decision whether to present mitigation evidence.

Thus, we look to whether "Petitioner would have changed his directions to his counsel" had counsel adequately fulfilled his duties in connection with the penalty phase.  *See Gilreath*, 234 F.3d at 552.  The petitioner "must identify the acts or omissions of counsel" that are alleged to constitute ineffective assistance of counsel at the penalty phase.  *Strickland*, 466 U.S. at 690.  And we look to whether "counsel's representation fell below an objective standard of

---

[14] As explained in Part III.C., *infra*, the Supreme Court's statement that it "[has] never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence," 550 U.S. at 479, did not undercut our caselaw concerning counsel's obligation to ensure that a client's waiver of a penalty phase defense is informed and knowing because the Supreme Court in *Landrigan* was framed by AEDPA's limitations on habeas review.

reasonableness" as of the time of counsel's performance. *Id.* at 688.

This approach is consistent with *Strickland* and *Landrigan*. *Strickland* explains that, to establish prejudice, the defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. When counsel commits errors in addition to conducting a deficient mitigation investigation, we look to see whether those additional errors, combined with the deficient investigation, establish a reasonable probability that the result of the proceeding would have been different.

In sum, for a defendant to successfully mount a penalty-phase ineffective assistance of counsel claim based on an insufficient mitigation investigation when *Landrigan* applies, the defendant must address two distinct deficient performance inquiries and two distinct prejudice inquiries.

As for the deficient performance inquiries, a defendant must satisfy the traditional deficient performance question outlined in *Strickland*, that counsel's performance in conducting the penalty phase investigation was deficient. *See* 466 U.S. at 690–91. Next, the defendant must show that counsel's deficient performance affected the defendant's decision not to present a penalty defense: here, the failure to adequately inform and advise Sanders in preparation for the penalty phase.

Turning to the prejudice inquiry, the defendant must first show that there is a reasonable likelihood that he would have changed his mind and allowed the presentation of a mitigation defense had he been properly advised and informed. *See Pope*, 752 F.3d at 1266. Second, he must also satisfy the traditional prejudice question—that there is a

reasonable likelihood that the new mitigating evidence, if presented at trial, would have led the jury to return an LWOP sentence rather than death. *Id.*; *see also Cummings*, 588 F.3d at 1360.

We apply this approach to Sanders's case, and conclude that Sanders has established that Hoover performed deficiently at the penalty phase and that his deficient performance prejudiced Sanders. The district court erred in concluding otherwise.

## B.

We first consider whether Hoover performed deficiently in his penalty phase investigation. We conclude that he did because he failed to perform even a rudimentary investigation into Sanders's social history and failed to obtain reasonably available records.[15]

Although the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms,'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688), "general principles have emerged regarding the duties of

---

[15] Sanders argues that Hoover performed deficiently by failing to request a psychological evaluation prior to Dr. Matychowiak's evaluation. As Hoover explained in his September 2007 declaration, the sole purpose of Dr. Matychowiak's interview was to determine Sanders's competence to forego the penalty phase, and not to develop mitigation evidence. Because we conclude that Hoover deficiently performed in failing to conduct a social history investigation, we do not address whether Hoover was also deficient in failing to request a psychological evaluation earlier in the proceedings.

criminal defense attorneys that inform our view as to the 'objective standard of reasonableness' by which we assess attorney performance, particularly with respect to the duty to investigate," *Summerlin*, 427 F.3d at 629. Both the Supreme Court and our court have long referenced the American Bar Association ("ABA") Standards for Criminal Justice "as indicia of the obligations of criminal defense attorneys." *Id.*; *see also Strickland*, 466 U.S. at 688 (citing ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function")). Our inquiry does not end with the standards, however, as the ABA Standards are "only guides to what reasonableness means, not its definition." *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (internal quotation marks and citation omitted).

Neither Sanders's actions nor the Supreme Court's holding in *Landrigan* excused Hoover from conducting a mitigation investigation. Although a client may direct his attorney not to conduct a mitigation investigation, that direction does not relieve counsel of the obligation to conduct an investigation. "[A] lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes." *Silva v. Woodford*, 279 F.3d 825, 840 (9th Cir. 2002); *Summerlin*, 427 F.3d at 638; *see also Andrews v. Davis*, 944 F.3d 1092, 1111 (9th Cir. 2019) ("A client may be 'fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation.'" (quoting *Porter v. McCollum*, 558 U.S. 30, 40 (2009)).

The initial false leads that Sanders gave Hoover did not excuse Hoover's failure to conduct a mitigation investigation. *See Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (holding that counsel's minimal investigation was deficient even though the defendant was "actively

obstructive by sending counsel off on false leads"). Indeed, we have said that a capital defense attorney "has an affirmative duty not to simply accept the facts as they might be presented at first blush, but rather to unearth for consideration at the sentencing phase all relevant mitigation information." *Doe v. Ayers*, 782 F.3d 425, 437 (9th Cir. 2015) (internal quotation marks, citation, and alteration in original omitted). Unlike in cases where the defendant interfered with the mitigation investigation by refusing to participate in mental health examinations, barring attorneys from interviewing family members, or refusing to provide information, *see Owens v. Guida*, 549 F.3d 399, 407–08 (6th Cir. 2008); *Cummings*, 588 F.3d at 1336, Sanders did not instruct Hoover to limit his investigation or refuse to provide information. To the contrary, Sanders gave Hoover "free reign" to look into his background. Sanders knew Hoover was speaking to his wife and family members and did not object, and in the first couple weeks of Hoover's representation, Sanders directed him towards a suitcase of files that could be used as mitigation evidence. The false leads at the beginning of their relationship do not excuse Hoover's limited investigation or render it reasonable.

Further, *Landrigan* did not change an attorney's obligation to conduct a mitigation investigation when a client objects to *presenting* a mitigation defense. *Landrigan* only concerned *Strickland*'s prejudice prong. *See* 550 U.S. at 480–81. The Supreme Court did not hold that as a result of a defendant's objection to a penalty phase defense, his counsel's minimal investigation was reasonable. *See id.* at 475–79; *see also Krawczuk*, 873 F.3d at 1301 n.2 (Martin, J., concurring) ("*Landrigan* never addressed the performance prong of *Strickland*, and so it did nothing to alter trial counsel's perennial 'obligation to conduct a

thorough investigation of the defendant's background.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

Because neither Sanders's expressed desires, nor *Landrigan*, excused Hoover from conducting a reasonable mitigation investigation, we evaluate whether Hoover's investigation was reasonable under the circumstances.

Although there are no hard and fast rules for what constitutes a reasonable mitigation investigation, we have emphasized the need for counsel to investigate the defendant's social background and to obtain related personal records.[16] To fulfill this obligation, counsel must make efforts to discover any reasonably available mitigating evidence, "includ[ing] inquiries into social background and evidence of family abuse." *Summerlin*, 427 F.3d at 630; *see also Wiggins*, 539 U.S. at 524–25. Hoover made no effort to understand Sanders's social background and family dynamics. Hoover did not interview a single person about Sanders's background, even though many of Sanders's family members were present at his trial, and Hoover spoke with those family members for other purposes. In contrast, Simrin began his representation of Cebreros by working with his investigator to locate and interview as many people as they could who knew Cebreros because, in Simrin's words,

---

[16] The relevant ABA standards also confirm this duty. "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980). Investigation of "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like" as well as "mitigating circumstances surrounding the commission of the offense itself" is "essential" to the defense attorney's role at sentencing. ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980).

"the lawyer must be educated about the client in order for the lawyer to competently represent the defendant in the penalty phase."

Had Hoover conducted even a minimal social history investigation through interviews with available family members, he would have discovered a case full of "classic mitigation evidence." *Stankewitz II*, 698 F.3d at 1172 (defining classic mitigation evidence as including a "tortured family history" and beatings from an alcoholic parent (quoting *Summerlin*, 427 F.3d at 631)); *see also Summerlin*, 427 F.3d at 635 (referring to "an abundance of available classic mitigation evidence concerning family history, abuse, physical impairments, and mental disorders"). As described above, the evidence presented at the evidentiary hearing detailing Sanders's unstable childhood, beatings from his parents, a history of alcoholism and drug abuse in the family, his own alcohol and drug abuse beginning in childhood, physical injuries, and difficulties in school present the "kind of troubled history [the Court has] declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535 (citation omitted). Hoover's failure to conduct any social history investigation constitutes deficient performance.

Relatedly, Hoover was deficient in failing to obtain relevant personal records. "[The penalty phase] investigation should include examination of mental and physical health records, school records, and criminal records." *Correll v. Ryan*, 539 F.3d 938, 943 (9th Cir. 2008); *see also Rompilla*, 545 U.S. at 385 (concluding that attorney was deficient in failing to review prior conviction file). In Sanders's case, there were reasonably available prison, school, juvenile delinquency, and military records.

Hoover's failure to secure prison and juvenile delinquency records ran contrary to professional standards at the time of trial. *See* ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980) ("The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities."). The prosecution informed Hoover of Sanders's armed robbery conviction before the first trial, giving Hoover many months before the penalty phase to obtain and review Hoover's prison and CYA records. Hoover's only explanation for failing to obtain and review Sanders's juvenile records was that he "did not think of [Sanders's] juvenile record as a source of information for the penalty phase." *See Correll*, 539 F.3d at 945 (concluding that "counsel's failure to obtain [] relevant records," including California Youth Authority records, "constituted deficient performance"). As detailed above, the juvenile records would have supported the social history detailing Sanders's chaotic and traumatic childhood.

School and military records—while not necessarily adding to information available from family members—would have supported the picture of a chaotic childhood. The available school records would have corroborated family members' accounts that Sanders moved around frequently, never staying at one school for very long. Sanders's military records would have corroborated family members' testimony about Sanders's ability to find some success in structured environments.

Finally, contrary to the district court's conclusion, the joint defense strategy to proceed to trial quickly did not excuse Hoover's deficient mitigation investigation. Nor was there a significant lack of investigatory resources available to Hoover. Counsel may make strategic choices about paths to pursue in a mitigation investigation, but not whether to

ignore the penalty phase. *See Wiggins*, 539 U.S. at 526 (explaining that "the unreasonableness of counsel's conduct" was underscored by the fact that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment"); *cf.* ABA Standards for Criminal Justice 4-8.1, commentary, p. 4-104 (2d ed. 1980) (explaining in non-capital sentencing context that counsel "will need to make some independent investigation" to prepare for sentencing). Hoover had an obligation to prepare for the penalty phase even if he believed that Sanders had a chance of an acquittal. *See Jackson v. Calderon*, 211 F.3d 1148, 1161–62 (9th Cir. 2000) (concluding that counsel's performance was deficient when counsel had conducted a minimal penalty phase investigation because counsel "never expected [his client]'s trial to reach the penalty phase"). And any cooperation between Hoover's investigation and Simrin's investigator, Roger Ruby, would have been irrelevant to the penalty phase, because each defendant needed to present their own penalty defense. As for investigatory resources, Hoover had access to similar resources as Simrin, who prepared a robust penalty investigation, and minimal resources were required to conduct social history interviews with members of Sanders's family, some of whom he spoke with for other reasons.

In sum, Hoover's penalty phase investigation was unreasonable under the circumstances, and his failure to conduct an adequate investigation is not excused by case law or Sanders's conduct.

## C.

We next turn to Hoover's duty to inform and advise Sanders about the nature of the penalty phase. We review for clear error the district court's findings about the attempts Hoover made to inform or advise Sanders, and review de

novo whether Hoover's efforts constituted deficient performance. *See Summerlin*, 427 F.3d at 628. We conclude that Hoover failed to ensure that Sanders's decision to forego a penalty phase defense was informed and knowing and that Hoover failed to adequately advise Sanders about the penalty phase over the course of his representation of Sanders, and thus performed deficiently.

A capital defense attorney has a duty to ensure that his client's decision not to present a penalty phase defense is informed and knowing.[17] *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993); *Silva*, 279 F.3d at 838; *Williams v. Woodford*, 384 F.3d 567, 622–23 (9th Cir. 2004); *Summerlin*, 427 F.3d at 638; *Hamilton*, 583 F.3d at 1119. There are multiple aspects to ensuring a decision is informed and knowing, but the objective is to ensure that the defendant comprehensively understands what he or she is giving up by declining to present a penalty defense.[18]

We first note that in *Landrigan*, the Supreme Court did not overrule our court's caselaw concerning counsel's duty to ensure that a client's decision not to present a penalty

---

[17] We also note that our court's use of the term "informed and knowing" refers to counsel's actions to ensure his client's decision to forego a penalty phase defense is based on an educated understanding of the penalty phase and evidence, not an in-court colloquy with the trial judge.

[18] Our dissenting colleague suggests that *Landrigan* established that any "informed and knowing" requirement does not demand more of counsel than the "minimal guidance" Landrigan's counsel told the sentencing court he provided his client. Dissent at 59–60. But the passage the dissent points to in *Landrigan* at best stands for the proposition that the defendant need not have "a specific colloquy with the court" to establish that his decision not to offer mitigating evidence was "informed and knowing." *See Landrigan*, 550 U.S. at 479.

phase defense is informed and knowing. *Landrigan*, which was decided under AEDPA, asked whether the informed and knowing requirement recognized by our court was clearly established law, not whether such a requirement was improper. Under AEDPA, "clearly established Federal law" concerns the Supreme Court's "decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412. Thus, the question before the Court "was not, strictly speaking, whether a knowing and voluntary requirement should be applied in this context, but rather, whether the Court had already articulated such a requirement at the time of Landrigan's first post-conviction hearing."[19] Dale E. Ho, *Silent at Sentencing: Waiver Doctrine and a Capital Defendant's Right to Present Mitigating Evidence after* Schriro v. Landrigan, 62 Fla. L. Rev. 721, 731 (2010) (emphasis omitted). The Court's statement that it has not yet imposed an informed and knowing requirement is not "clearly irreconcilable" with our court's precedent requiring a defendant's decision to forego a penalty defense to be informed and knowing. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc); *see also Hamilton*, 583 F.3d at 1119 (concluding, in a post-*Landrigan* case, that a

---

[19] The Supreme Court's citation in *Landrigan* to *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), suggests the Court may have been referring to the necessity of a colloquy before the court to ensure the defendant's waiver of a penalty defense is proper, rather than counsel's duty in the context of an ineffective assistance of counsel claim to ensure a decision to forego the penalty phase is informed and knowing. Post-*Landrigan*, our sister circuits have acknowledged that *Landrigan* did not hold that counsel's duty or a colloquy before the court is improper, *see Clark v. Thaler*, 673 F.3d 410, 422 (5th Cir. 2012), and have declined to address whether such a requirement exists, *see Thomas v. Horn*, 570 F.3d 105, 129 n.9 (3d Cir. 2009) ("[W]e offer no opinion on whether a waiver of the right to present mitigating evidence must be 'informed and knowing.'").

defendant "did not make a knowing and informed decision not to present mitigation evidence").

As we explain below, Hoover failed to ensure that Sanders's decision not to present a penalty phase defense was informed and knowing.  First, Hoover failed to adequately inform Sanders about the structure of the penalty phase.  Counsel is deficient if he makes only "minimal efforts to explain" the structure and significance of the penalty phase.  *Cf. Correll*, 539 F.3d at 943.  In his September 2007 declaration, Hoover admitted that at the time of trial he "was not well-versed in the rules and procedure for the penalty phase" and testified at the evidentiary hearing that he only explained the penalty phase "in a nutshell."  "[N]o lawyer can perform adequately in ignorance of the applicable law."  ABA Standards for Criminal Justice 4-1.1, commentary, p. 4-9 (2d ed. 1980). This principle extends to knowledge of the procedures governing the penalty phase of a death penalty case.  Sanders could not have been adequately informed about the procedure or defense he was foregoing when his attorney did not understand all the mechanics of that procedure and only provided a basic explanation of the penalty phase as he understood it.

Sanders's lack of understanding of the basic mechanics of the penalty phase was apparent before the penalty phase began.  Dr. Matychowiak's report indicated that Sanders desired neither a death nor LWOP sentence, and that Sanders told him during the examination that he "fe[lt] the court will just simply have to decide on something or anything other than that."[20]  Sanders's failure to understand that the court

---

[20] The district court observed that "this statement viewed in context seems to suggest merely a reassertion of his objection to LWOP and

could not impose a sentence other than LWOP or the death penalty demonstrates that his decision to forego a defense was not informed and knowing.

Second, Hoover failed to educate Sanders about the two possible sentences. Counsel must "be familiar with the sentencing alternatives available to the court" and fully explain to his client "[t]he consequences of the various dispositions available." ABA Standards for Criminal Justice 4-8.1(a) (2d ed. 1980). Further, counsel should "carefully explain" what each sentencing option "will mean for the defendant personally." ABA Standards for Criminal Justice 4-8.1, commentary, p. 4-103 (2d ed. 1980). And counsel has a duty to "fully educate [the client] about the ramifications of his decision" not to present a penalty defense, *Silva*, 279 F.3d at 840–41, including the full consequences of each sentencing option.

Hoover, however, "never explicitly explained the sentences or what they meant" because it "seemed obvious." But the prison conditions for LWOP and death row prisoners are not the same. Sanders understood LWOP to mean that

insistence upon his innocence." But in his meeting with Dr. Matychowiak, Sanders stated that "[h]e [did] not want the attorney to argue in favor of a death penalty." That statement and others during the meeting demonstrate that Sanders was confused about the appeal process from death and LWOP sentences. Dr. Matychowiak wrote that Sanders told him that "if he has a life without parole sentence he would be more stuck in that even if there were an appeal or a review they could not give a more strict sentence" and that "if one had a death sentence and there were a review or an appeal, one could get a lighter sentence." In context, it appears Sanders may have believed he could receive less than an LWOP sentence if his death sentence were reversed on appeal, and/or that death could not be imposed if his conviction was reversed and his case re-tried. In short, Dr. Matychowiak's report demonstrates overall confusion about the sentences and the process of appellate review.

there was no possibility he would ever get out of prison, but Sanders did not have any idea "where [he] would be imprisoned, what kind of cell [he would] live in, or what kind of programs and privileges [he] might have" with an LWOP sentence.  Sanders was not in a position to determine that LWOP was just as unacceptable as a death sentence without knowing anything about the conditions of confinement under either sentence.

Third, Hoover failed to inform Sanders of a significant mitigation factor that he could have presented to the jury—lingering doubt.  Counsel must inform his client the key mitigation factors that could be presented in the penalty phase.  *See Correll*, 539 F.3d at 943 (faulting counsel for failing to explain to his client the "possibility of a mitigation defense arising from [the defendant]'s drug use, brain damage, family history, or psychiatric record").  Although lingering doubt may not be a mitigation factor in every death penalty trial, considering "the facts of [this] particular case, viewed as of the time of [Hoover]'s conduct," *Strickland*, 466 U.S. at 690, his failure to inform Sanders that he could argue lingering doubt as a mitigation factor was unreasonable.

A lingering doubt defense was available, and Hoover's failure to inform Sanders of the availability of the defense, or explain how it fit with the facts of his conviction, was not a strategic decision.[21]  "Generally, we credit the statements of defense counsel as to whether their decisions at trial

---

[21] The California Supreme Court held in 1964 that lingering doubt as to a capital defendant's guilt could be asserted as a mitigating factor in the penalty phase. *People v. Terry*, 390 P.2d 381, 387–88 (Cal. 1964), *overruled on other grounds by People v. Laino*, 87 P.3d 27, 35 (Cal. 2004)).

were—or were not—based on strategic judgments." *Doe*, 782 F.3d at 445. Hoover stated in his September 2007 declaration in federal habeas proceedings that he "did not think, at the time of the trial, that under California law lingering doubt could be argued in mitigation at a capital penalty phase," and also testified at the evidentiary hearing that he "was not well-versed in the rules and procedure for the penalty phase."

A lingering doubt defense would have been appropriate in this case for two reasons. First, there was a lack of objective evidence connecting Sanders to the crime, and he had presented an alibi defense. The presence of a holdout juror in the first trial indicated that some jurors may have harbored some doubt as to his guilt, even if he was ultimately convicted. And Hoover had strongly believed that there was not enough evidence to convict Sanders. Second, a lingering doubt defense would have addressed some of Sanders's concerns about the penalty phase. As Susan Sawyer explained in her declaration, "[g]iven Mr. Sanders's insistence on his innocence, it would have been crucial to explain that the mitigation case did not have to concede guilt" because "any lingering doubt the jury had about its guilt phase verdicts could be considered as a mitigating factor." For all of the above reasons, Hoover was deficient in failing to explain to Sanders the possible mitigation defenses.

Fourth, Hoover failed to explain the types of mitigation evidence available and how it could be used. We have held that a defendant's decision not to present mitigation evidence is informed and knowing when counsel has explained the available evidence and the ramifications of not presenting such evidence. *See Jeffries*, 5 F.3d at 1198 (finding that a defendant's decision not to present a penalty

defense was informed and knowing as counsel had discussed available mitigation evidence and "the ramifications of failing to present the evidence"); *Williams v. Woodford*, 384 F.3d at 623. Although counsel is not required to inform his client of every possible piece of mitigation evidence or possible arguments, counsel must explain the general contours of the available evidence, and the purposes different types of evidence would serve. Here, Hoover did not explain the basic contours of possible evidence, as he did not inform Sanders of the availability or possible uses of *any* mitigation evidence.[22]   Indeed, it is doubtful that Hoover could have adequately informed Sanders of the possible evidence had he sought to do so because his bare bones investigation failed to uncover any meaningful information. This failure to inform Sanders of the possible mitigation evidence, along with the other matters discussed above, all contributed to Hoover's failure to ensure that Sanders's decision to forego a penalty phase defense was informed and knowing.

Not only did Hoover have a duty to inform Sanders about a penalty phase defense and the ramifications of foregoing it, he also had a duty to advise Sanders throughout the course of trial preparations, so that Sanders could make informed decisions on matters related to his defense. Attorneys must

---

[22] The district court noted that Hoover had informed the trial court that he had explained to Sanders the "basic tenants [sic] of what [the] evidence would consist of." But Hoover was not prepared to present any evidence. He testified at the evidentiary hearing that he "never got into the list of witnesses" with Sanders. Even if Sanders had "[known] his family members, his parents, grandmother Ruth and sister Suzanne were available in court at the penalty trial to offer testimony on his behalf" as the district court found, Sanders could not have known what they would have testified about because Hoover had not discussed their testimony with them.

"maintain constitutionally adequate contact [and] engage in constitutionally adequate consultation" in preparation for the penalty phase. *Correll*, 539 F.3d at 943; *see also Summerlin*, 427 F.3d at 639 (explaining counsel must consult with his client prior to the penalty phase and "provide the advice necessary" to aid the client in making a decision about presenting a mitigation defense); *cf.* ABA Standards for Criminal Justice 4-3.8, commentary, p. 4-51 (2d ed. 1980) (discussing the duty to keep a client informed). As the expert defense attorneys explained in their declarations, it takes clients time—sometimes months—to fully comprehend and make deliberate decisions about the penalty phase, thus requiring counsel to start conversations with a defendant about the penalty phase early on in the litigation.

Hoover, however, waited until January 1982 to advise Sanders on the penalty phase.[23] As he described in his declaration, "[Sanders]'s position about the possible sentences did not become a problem until the jury returned its guilty verdict at the end of the second trial. And I did not

---

[23] The district court found that Hoover had discussed the penalty phase with Sanders three times prior to trial, which is supported by the record. The district court's characterization that these early conversations included an explanation of the penalty phase, however, is not supported by the record. The district court found that "[a]s early as Petitioner's first trial (resulting in the mistrial), Hoover discussed with Petitioner the penalty phase process 'in a nutshell,'" and cited to Hoover's testimony at the evidentiary hearing. But the referenced testimony concerned a conversation Hoover had with Sanders in between the guilty verdict and the penalty phase of the second trial. In his September 2007 declaration, Hoover explained that in the pre-trial conversations about the penalty phase, "he never explicitly explained the sentences or what they meant," and he "did not explain the definition or role of mitigation, or the definition or role of aggravation, the sentencing instruction that the jury would follow in making its penalty choice, or the judge's role in deciding the sentence."

turn my attention in earnest to this issue until it was clear there would be a penalty phase." But Sanders had expressed resistance to LWOP early on in the attorney-client relationship. Hoover's failure to advise Sanders about the penalty phase throughout the course of his representation also constituted deficient performance.

In sum, Hoover's failure to ensure that Sanders's decision to forego a penalty defense was informed and knowing, and his failure to adequately advise Sanders about the penalty phase throughout the course of the litigation, constituted constitutionally deficient performance.

### D.

We review de novo whether Sanders was prejudiced by Hoover's failure to inform and advise him about the penalty phase. To that end, we must determine whether there is a reasonable likelihood that Sanders would have changed his mind had Hoover provided effective assistance. *See Summerlin*, 427 F.3d at 638; *Pope*, 752 F.3d at 1265–67. We conclude that there is a reasonable likelihood he would have changed his mind.

Sanders's initial position, that an LWOP sentence was an unacceptable option, is a common response from defendants facing a death sentence, and one that experienced attorneys can usually overcome. As described by Simrin, Sawyer, and Stetler, many death-eligible defendants initially reject the idea of an LWOP sentence, but most change their minds with competent representation. As the experts explained addressing a client's concerns about an LWOP sentence requires conversations over the course of the representation. Unsurprisingly, following Hoover's failure to inform and advise Sanders about the penalty phase, Hoover's last-minute efforts to address Sanders's concerns about the

penalty phase had no effect. All three experts opined that had Hoover performed reasonably, there is a strong likelihood that Sanders would have acted like nearly every other capital defendant in his situation and changed his mind. Initial resistance to an LWOP sentence is not uncommon, but that resistance, in most cases, can be overcome with the assistance of a competent lawyer.

Mitigation evidence that Hoover could have discovered could have also reminded Sanders that his life had value. As Sawyer explained, "[s]ometimes, the client's seeing the results of positive mitigating evidence – for example, learning how much his generosity mattered to a friend – begins to soften his resistance to a penalty defense." Arlene Fangmeyer, who had dated Sanders's cousin, explained that "[Sanders] was the person [she] turned to in times of need" when she struggled to pay bills and take care of her daughter. Sanders's siblings also noted that he was fiercely protective of them. Informing Sanders of this evidence could have softened his resistance to presenting a penalty phase defense.

Further, there is nothing in Sanders's background that suggests he would have been the rare defendant who would not have changed his mind. Dr. Pablo Stewart, the psychiatrist, explained that "Mr. Sanders's cognitive impairments . . . prevented him from understanding that he did not have the option of simply doing nothing." At the same time, Sanders was "easily led" and responded to authority figures like Hoover. Hoover testified that he and Sanders had a good relationship, which would have given him a step up in developing a rapport with Sanders in discussions about the penalty phase and the ramifications of foregoing a defense, had Hoover pursued those discussions.

Hoover's decision to wait until after the guilty verdict to address the penalty phase in earnest, along with Sanders's

opposition to it, increased the odds that Sanders would not change his mind. As explained by Dr. Stewart and Dr. Kriegler, the "overwhelming psychological stress" combined with his "difficulties in executive functioning including response flexibility" led him to "shut down emotionally and become cognitively flooded." Sanders's defiant opposition to presenting a penalty phase defense following the guilty verdict likely would have looked different had Hoover adequately advised him over the course of their attorney-client relationship. In light of attorney Cook's assessment after he spoke with Sanders prior to the penalty phase that "there was some ambivalence" in Sanders's feelings, it was not a foregone conclusion that Sanders would have remained opposed to presenting mitigation evidence, including lingering doubt as to his involvement in the killing.

Further, Sanders's case does not resemble situations in which courts have concluded that there was insufficient evidence to conclude that the defendant would have changed his mind. In addition to the testimony and declarations from legal experts, Sanders presented his own affidavit stating he would have changed his mind had he been competently informed about the penalty phase, as well as declarations from mental health experts who opined that he would have changed his mind.[24] In contrast, in cases like the Eleventh Circuit's decision in *Pope*, the petitioner "offered no affidavit, deposition, or statement from himself, his counsel,

---

[24] In Sander's September 2000 declaration, he stated: "Had I understood at the time I decided to forego a penalty defense what I know now about the choices in presenting mitigating evidence and had my trial attorney, Frank Hoover, discussed the possible mitigating evidence with me, I would have decided to go ahead and present a penalty defense including at least some mitigation evidence."

or even from his mental health experts claiming that the petitioner would have changed his instructions to counsel if advised of mitigation evidence." 752 F.3d at 1267; *see also Krawczuk*, 873 F.3d at 1296 ("[T]he record is devoid of any affidavit, deposition, or statement from Krawczuk, [his attorney], the mental health experts, or Krawczuk's friends and family even suggesting that Krawczuk would have instructed [his attorney] differently had he been fully aware of all the available mitigation evidence."). And unlike the defendant in *Cummings*, 588 F.3d at 1343, who maintained an objection to LWOP through the beginning of state habeas proceedings, Sanders viewed his opposition to LWOP as "emotional and stupid" and challenged his death sentence "since the very beginning of [his] appeals."

We cannot state with absolute certainty that Sanders would have changed his mind. Such certainty, however, is not necessary. Because there is a reasonable likelihood Sanders would have changed his mind, he was prejudiced by Hoover's failure to inform and advise him about the penalty phase.

## E.

At the final step of our *Strickland* analysis, we evaluate the second prejudice inquiry—concerning whether the mitigation evidence would have swayed at least one juror to vote for LWOP. We conclude that there is a reasonable likelihood that the penalty phase verdict would have been different had Hoover undertaken a reasonable mitigation investigation and presented a penalty defense.

"In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence" to determine whether "there is a reasonable probability that at least one juror would have struck a

different balance." *Wiggins*, 539 U.S. at 534, 537. Here, the mitigation evidence discussed above relating to Sanders's social history and lingering doubt about whether he committed the murder could have reasonably resulted in at least one juror changing his or her mind.

Evidence introduced at the evidentiary hearing, which we discussed above, reveals the "same sort of classic mitigation evidence" that we have found sufficient to establish prejudice.[25] *Stankewitz II*, 698 F.3d at 1172; *Summerlin*, 427 F.3d at 635. Hoover's failure to present reasonably available evidence concerning Sanders's unstable childhood, abuse from his parents, history of alcoholism and drug abuse, and difficulties in school prevented the jury from considering the "kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535 (citation omitted).

The available mitigation evidence also included positive character evidence that the jury could have considered. *See Avena v. Chappell*, 932 F.3d 1237, 1251 (9th Cir. 2019) (explaining that positive character testimony from friends and family, in addition to mitigation evidence detailing childhood abuse, "would have countered the prosecution's characterization of [the defendant] as nothing more than a 'killing machine' with a 'malignant heart'"). As discussed above, Arlene Fangmeyer could have noted Sanders's

---

[25] Because we do not consider whether Hoover was deficient in failing to request a psychiatric or psychological evaluation of Sanders, we do not discuss the available mental health evidence when discussing whether mitigation evidence would have changed a juror's vote.

importance to her "in times of need," and Sanders's siblings could have testified to his protectiveness.

Further, Hoover could have also argued lingering doubt as a mitigation factor. The prosecution's case at the guilt phase rested on the testimony of two unreliable witnesses, and there was no physical evidence connecting either defendant to the crime scene.[26] The jury's inability to reach a verdict at the first trial supports the assertion that the case against Sanders was relatively weak. As lingering doubt is "an extremely effective [penalty phase] argument for defendants in capital cases," *Cox v. Ayers*, 613 F.3d 883, 898 (9th Cir. 2010) (quoting *Lockhart v. McCree*, 476 U.S. 162, 181 (1986)), and the prosecution's case against Sanders was far from overwhelming, it is reasonably likely that the outcome of Sanders's penalty trial would have been different if he had raised a lingering doubt as a mitigation factor.

Although, as in all capital cases, the circumstances of the murder were disturbing and serious, and the death of Ms. Allen was an immense tragedy, Sanders's crimes were not especially egregious "[w]hen compared with the offenses of other death-eligible defendants." *Doe*, 782 F.3d at 447. The California Supreme Court invalidated two of the four aggravating circumstances, leaving only the robbery-murder and witness-killing special circumstance findings. *People v. Sanders*, 797 P.2d at 586–89. We have found prejudice in situations involving more serious aggravating factors upon presentation of similar mitigation evidence. *See, e.g., Avena*, 932 F.3d at 1251–52 (finding prejudice

---

[26] Brenda Maxwell had admitted to lying on multiple occasions, including at the preliminary hearing. Dale Boender suffered amnesia from his head injuries and had no recollection of many events in the days prior to and weeks after the attack.

when the defendant "committed two brazen murders during a night of malicious criminal activity" and "was implicated in the violent death of another inmate" and "assaulted a police officer" while awaiting trial for the two murders); *Correll*, 539 F.3d at 941, 951–55 (finding prejudice where defendant was guilty of triple murder); *Douglas v. Woodford*, 316 F.3d 1079, 1083, 1090–91 (9th Cir. 2003) (finding prejudice where defendant sexually assaulted two teenage girls and then strangled them to death). Further, it is unclear who between Sanders and Cebreros struck the fatal blows, a point Hoover could have raised to argue Sanders was less culpable than Cebreros.[27] Finally, the prosecutor did not seek the death penalty for Sanders's codefendant. *See Silva*, 279 F.3d at 849 (noting that an accomplice was sentenced to LWOP when evaluating prejudice).

Nor was the evidence of Sanders's past armed robberies particularly aggravating. These crimes were over a decade old by the time of the trial. Furthermore, Sanders did not harm anyone in the commission of the robberies and, in fact, one of the victims testified that he cooperated in preventing harm to any of his customers. Sanders's jail records from the 1971 armed robbery conviction also would have shown that he was "very cooperative" with law enforcement and that he had had no intention of hurting anyone and had only committed the crimes for drugs and food. *See Doe*, 782 F.3d at 447 (describing the defendant's criminal record as light when "his only previous conviction was for an armed

---

[27] The prosecutor argued that Sanders was most likely the actual killer of Allen because Boender had testified that Sanders had been the one to initially throw him to the ground. But Cebreros was the larger of the two men, and Boender had initially told law enforcement that Cebreros was the one who had pushed him to the ground.

robbery, in which no one was injured, committed when he was a juvenile").

Sanders's prior conviction records and related prison records could also have steered the jury away from a death sentence. Sanders's prison records would have shown that he had adjusted well to prison life and had been commended for both his work at his job placements and his enthusiasm in the classroom setting. "This evidence would have aided the jury in determining whether [Sanders] would be a danger to other inmates or prison officers if sentenced to life in prison." *Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir. 2001).

The jury's initial hesitance in reaching a verdict in the penalty phase also weighs towards a finding of prejudice.[28] *See Stankewitz v. Woodford*, 365 F.3d 706, 724–25 (9th Cir. 2004) ("*Stankewitz I*"). A jury note indicating hesitance in reaching a penalty phase verdict "suggest[s] that a death sentence for [Sanders] was not a foregone conclusion." *Silva*, 279 F.3d at 849–50. Here, the jury asked the trial court "What are the consequences if the jury is unable to arrive at a unanimous decision?" This initial hesitance only adds further support to a finding of prejudice when reweighing the evidence.

Further, there is a reasonable possibility that the jury concluded or determined that they had no choice but to impose a death sentence. The jury was instructed that if it "conclude[d] that the aggravating circumstances outweigh

---

[28] In our review of whether Sanders was prejudiced by Hoover's deficient investigation, we do not consider the juror declarations offered by Sanders, nor do we decide whether they are admissible under Federal Rule of Evidence 606(b).

the mitigating circumstances, [it] shall impose a sentence of death." And the prosecutor told the jury that this instruction meant that "the proper sentence" was death because there were no mitigating circumstances and thus there was "nothing to weigh because everything falls on one side of the weighing process." Because Hoover waived argument, no one challenged this explanation. And it seems likely that the jury followed the instructions because the jury asked for a copy of them during deliberations.

"In this case, the jury recommended the death penalty without knowing anything about [Sanders]'s troubled background." *Noguera v. Davis*, 5 F.4th 1020, 1043 (9th Cir. 2021). Sanders's "counsel did nothing to counterbalance the prosecutor's view of [Sanders] or to portray [Sanders] as a human being, albeit one who had committed [a] violent crime[]." *Andrews*, 944 F.3d at 1099. When considering the abundance of classic mitigation evidence, the possibility of a strong lingering doubt defense, the relatively weak aggravating circumstances, and the jury's apparent hesitance in imposing a death sentence despite instructions that appeared to give them no other choice, we conclude that there is a reasonable likelihood that at least one juror would have struck a different balance. *Wiggins*, 539 U.S. at 537. Thus, Sanders suffered sufficient prejudice to warrant setting aside his death sentence.

## IV.

The State argues that a remand to the district court to conduct the originally proposed second stage of the evidentiary hearing is necessary so that the State can contest the mitigation evidence presented at the first stage. By failing to object to the district court's order that the court would take as true the proffered mitigation evidence for the purpose of litigating the prejudice question, the State

forfeited any challenge to the district court's decision to vacate the second stage of the evidentiary hearing. *Puckett v. United States*, 556 U.S. 129, 134 (2009).

## V.

Competent representation in a capital case requires more than just advocacy at the guilt phase of trial. Hoover had no prior experience in capital defense, made no effort to educate himself about the penalty phase, and made next to no effort to prepare for the penalty phase until days before it began. Unsurprisingly given this lack of knowledge, Hoover conducted a bare bones investigation and failed to adequately inform and advise Sanders about the penalty phase. This failure resulted in the absence of any penalty defense in a case with a relatively weak prosecution case, and a client who did not know what he was giving up by foregoing a penalty defense.

We therefore reverse the district court's denial of habeas relief and remand with instructions to issue a conditional writ of habeas corpus granting Sanders a new penalty phase trial.

**REVERSED and REMANDED with instructions.**

MILLER, Circuit Judge, dissenting:

Ronald Sanders claims that he received ineffective assistance of counsel during the 1982 trial at which he was convicted of first-degree murder and sentenced to death. He must show not only that counsel's performance was deficient but also that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). I agree

with Sanders that the performance of his counsel, Frank Hoover, was deficient because Hoover failed to investigate potential mitigating evidence. *See Rompilla v. Beard*, 545 U.S. 374, 384–90 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524–28 (2003). I also agree that if mitigating evidence had been presented to the jury, at least one juror might have voted for life imprisonment. But there remains a gap in Sanders's theory: Simply investigating mitigating evidence would not have made any difference if Sanders did not want that evidence to be presented to the jury. *See Schriro v. Landrigan*, 550 U.S. 465, 477 (2007); *Cox v. Del Papa*, 542 F.3d 669, 683 (9th Cir. 2008).

The district court found that Sanders opposed the presentation of any mitigating evidence, and that finding is amply supported by the record. Hoover testified that Sanders was so opposed to any mitigation case that he threatened to obstruct Hoover from presenting one: "[H]e was determined to foul it up. He said . . . that he would act out; that he would do something that would cause the jury to be—to be ill-disposed toward him." For example, Sanders said that "he would jump up and say things so that he would be disliked by the jury." In Hoover's view, those were not idle threats: "[W]hen he said he was going to stand up and act out[,] his tone, his presence, the way he expressed it to me made me believe that it was likely to happen." Sanders was willing to obstruct his own penalty defense because he found the prospect of life in prison without the possibility of parole to be "unacceptable." As Hoover described it, Sanders "found this . . . whole idea of living his entire life in a cell that could go on for 50 years—he thought that was immoral," and he believed that it "would be a worse sentence than being killed." Indeed, Sanders threatened that if sentenced to life imprisonment, he would stage an escape attempt so that he would be shot by guards.

In an effort to establish ineffective assistance notwithstanding the district court's finding, Sanders says, first, that Hoover failed to discharge his duty to ensure that Sanders's decision not to present a penalty phase defense was "informed and knowing," and, second, that if Hoover had carried out that duty, there is a reasonable likelihood that Sanders would have changed his mind. Neither step in that argument is valid, so I would affirm the district court's denial of habeas relief.

*First*, Sanders's theory of counsel's duty is contrary to Supreme Court precedent. The Court has never held that counsel has a duty to ensure that a client's decision not to present mitigating evidence is "informed and knowing." It said precisely that in *Landrigan*: "We have *never* imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." 550 U.S. at 479 (emphasis added). To be fair, a statement that the Court has not imposed a requirement is not quite the same as a statement that no such requirement exists. What is more significant is the way the Court resolved the case: It assumed without deciding that an "informed and knowing" requirement existed, and it then determined that the requirement was satisfied because counsel had "explained to Landrigan the importance of mitigating evidence, 'especially concerning the fact that the State is seeking the death penalty,'" and had also "explained to Landrigan that as counsel, he had a duty to disclose 'any and all mitigating factors . . . to th[e] [c]ourt for consideration regarding the sentencing.'" 550 U.S. at 479 (alterations in original); *see also id.* ("[W]e have never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence."). The decision in *Landrigan* establishes that whatever "informed and knowing"

requirement might exist, it does not demand more than the minimal guidance that Landrigan's counsel provided.

If our earlier cases had required more of counsel, they would have been abrogated by *Landrigan*. But they did not. Although some of our cases used the phrase "informed and knowing," they considered an issue very different from that presented here. Specifically, they involved defendants who impeded the presentation of a mitigation case in limited ways but who did *not* object to presenting any penalty defense at all. We held that a defendant's opposition to presenting some forms of mitigating evidence does not eliminate the potential prejudice from counsel's failure to investigate other evidence. In *Silva v. Woodford*, for example, the defendant asked counsel not to contact his parents to develop information about his childhood, but he did not express opposition to presenting other forms of mitigating evidence, such as testimony from his siblings and friends. 279 F.3d 825, 838 (9th Cir. 2002). And in *Summerlin v. Schriro*, the defendant objected to presenting the testimony of a psychologist, but we emphasized that he never "instructed his attorney not to present any penalty phase defense whatsoever." 427 F.3d 623, 637 (9th Cir. 2005). That, of course, is precisely what Sanders did.

Hoover provided far more information to his client than did Landrigan's counsel. He explained "the significance of the sentencing hearing," *Correll v. Ryan*, 539 F.3d 938, 943 (9th Cir. 2008), by telling Sanders that it was "a proceeding that would be only interested in the disposition between life without [parole] and death." He informed Sanders of some of the types of mitigation evidence he could present at the penalty phase, including background and character evidence. And he told Sanders the consequences of not presenting a case in mitigation—"that if he was going to

decide it he was going to decide it and actually get the death penalty."

The suggestion that Hoover left Sanders inadequately informed is particularly odd given the vigor of Hoover's efforts to educate Sanders about the choice he faced. Hoover arranged for a psychiatrist to examine Sanders to make sure that he was mentally competent. The psychiatrist's notes reveal that Sanders knew that "[t]he two possibilities are life without parole or death" and that Sanders had "a list of twenty-six or seven reasons written out for his point of view" that life without parole was unacceptable. Hoover tried to disabuse Sanders of mistaken beliefs he thought might be motivating his decision, such as the idea that he would be better positioned to appeal if sentenced to death. Hoover explained that if Sanders were sentenced to life without parole he could be held somewhere other than San Quentin and that he could be pardoned or his sentence commuted. After finding that his own efforts had been unsuccessful, Hoover enlisted another attorney to talk to Sanders. And he asked Sanders's family to speak to him as well. Specifically, he asked Sanders's wife to visit Sanders and attempt to change his mind; he also flew Sanders's parents to the prison so that Sanders could "discuss his feelings and beliefs" with them. After all of that, Sanders opposed the presentation of mitigating evidence not because he was confused about his options but because he believed life imprisonment to be worse than the death penalty.

*Second*, Sanders has not shown that anything Hoover might have told him would have made any difference to his decision not to present a case in mitigation. Most of the additional information Hoover could have provided relates to how Sanders could have presented a mitigation case in an effort to avoid a death sentence—for example, information

about the structure of the penalty phase and the different types of mitigation evidence that could be presented in that phase. None of that information, however, would have had any relevance to Sanders's determination that a death sentence was preferrable to life in prison.

Nor was Sanders lacking in information about the two possible sentences: life without parole and death. Sanders says that Hoover should also have explained the differences in prison conditions for life and death-row prisoners. Hoover did address that issue, to a degree, by explaining that if serving a life sentence, Sanders would not have to be held at San Quentin. And in light of Sanders's expressed objections to the "whole idea of living his entire life in a cell," it is not clear why more information about conditions on death row would have changed his mind. In any event, the conditions on death row have become relevant only because Sanders has managed to postpone his execution for nearly four decades—with some help from this court, which set aside his death sentence once before, only to be reversed by the Supreme Court. *Sanders v. Woodford*, 373 F.3d 1054 (9th Cir. 2004), *rev'd*, *Brown v. Sanders*, 546 U.S. 212 (2006). Addressing a claim that lengthy pre-execution delay violates the Eighth Amendment, Justice Thomas has observed that "[i]t makes a mockery of our system of justice for a convicted murderer, who, through his own interminable efforts of delay has secured the almost-indefinite postponement of his sentence, to then claim that the almost-indefinite postponement renders his sentence unconstitutional." *Reynolds v. Florida*, 139 S. Ct. 27, 31 (2018) (Thomas, J., concurring in the denial of certiorari) (internal quotation marks and citation omitted). Much the same could be said of the argument presented here.

\* \* \*

Sanders understood that the penalty phase would determine whether he received a sentence of life without parole or death. He chose not to present mitigating evidence because "he could not participate in a proceeding that would result in [a life] sentence"—in his view, "a worse sentence than being killed." He now wishes he had made a different choice, so he argues that Hoover should have made greater, or at least more effective, efforts to get him to change his mind. That view of the attorney's role is inconsistent not only with *Landrigan* but also with the principle that it is for the client, not the lawyer, to define the objectives of the representation. Persuading Sanders to seek a different outcome in the penalty phase—persuading him, as the court puts it today, "that his life had value"—may have been an appropriate task for a psychiatrist, a philosopher, or a priest. The Sixth Amendment did not make it the duty of his lawyer.